ROBERT J. NICOLAZZI AND JUDITH M. NICOLAZZI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12611–79.     Filed July 21, 1982.

*Abraham N. M. Shashy, Jr.*, and *Alan Levine*, for the petitioners.

*William F. Garrow*, for the respondent.

DAWSON, *Judge*: Respondent determined a deficiency in petitioners' 1976 Federal income tax in the amount of $3,735. The deficiency stems from the disallowance of a $10,075 fee paid by Robert Nicolazzi during 1976 to Melbourne Concept, Inc., a company engaged in the business of procuring noncompetitive Federal oil and gas leases on behalf of its clients. The following issues are presented for decision:

(1) Whether any portion of the $10,075 fee is deductible under section 212(1) or (2);[1]

(2) Whether any portion of the fee is deductible as a loss on a transaction entered into for profit under section 165.

If all or a portion of the fee is currently deductible under one of the foregoing provisions, then we must decide whether and to what extent the deduction is limited by the at-risk rules of section 465.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference.

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, unless otherwise indicated.

Petitioners Robert J. Nicolazzi (hereinafter petitioner) and Judith M. Nicolazzi are husband and wife and resided in West Bloomfield, Mich., when they filed their petition in this case. They timely filed a joint Federal income tax return for the calendar year 1976 with the Internal Revenue Service Center in Cincinnati, Ohio. The petitioners are cash method taxpayers.

On June 23, 1976, petitioner entered into an advisory and service agreement (agreement) with Melbourne Concept, Inc. (Melbourne), a company which provides certain services to persons interested in leasing federally owned lands for oil and gas exploration. Petitioner was referred to Melbourne by Robert Johnston, an agent commissioned by Melbourne to solicit business. Joining petitioner in the agreement were two other individuals, Mary E. Cannon and Christine W. Willis (hereinafter the co-participants). Their interests under the agreement were set at 25 percent and 50 percent, respectively. Petitioner was assigned the remaining 25 percent. To understand the nature of the services provided by Melbourne under the terms of the agreement, a brief discussion of the various ways in which Federal oil and gas leases may be obtained is necessary.

## Background Information Concerning Federal Oil and Gas Leases

Under the Mineral Leasing Act of 1920, the Government is required to make available to U.S. citizens the mineral leasehold rights with respect to Federal lands. The regulations under the act provide that oil and gas leases are to have 10-year terms and carry an annual rental, which was 50 cents an acre during the year in issue. The leases are renewable for an additional 2-year period if drilling has commenced when the lease expires, and may be renewed indefinitely if the property is producing oil and gas in paying quantities.

The oil and gas leases are divided into two basic categories: competitive and noncompetitive. Competitive leases are on parcels located within a "known geologic structure," i.e., a geologic formation which is either currently producing oil and gas or thought to be a likely candidate for future production. When the existing lease on the property expires, it is advertised as available for lease by the Bureau of Land Management

of the Department of Interior (BLM), and sealed bids are then submitted by prospective lessees, principally the major oil companies.

Noncompetitive leases relate to properties which are not located near a known geologic structure. There are basically two different methods by which a noncompetitive lease may be acquired. Leases which have expired or been relinquished or canceled are known as lottery or simultaneous-filing leases and are posted on the third Monday of each month in the BLM land Offices which have jurisdiction over the underlying properties. Each person who wishes to obtain a particular lottery lease must file a lease application form with the proper BLM Office, together with a $10 nonrefundable filing fee, no later than the fifth working day after the list of available leases is posted. An applicant is limited to only one application per lease, but there is no limit on the number of separate leases with respect to which he can file applications each month. If, as is usually the case, a BLM Office receives multiple applications with respect to a particular lease, a public drawing is held to determine the applicant to whom the lease will be awarded. Leases are issued to successful applicants upon the payment of the first-year rental within 15 days after being notified of the drawing results.

A different procedure applies to noncompetitive leases which have not previously been issued, or which were originally posted as lottery leases but were not sought after by any qualified applicants. Such leases are commonly known as open-parcel or over-the-counter leases. They are made available to qualified applicants on a first-come, first-served basis. The applicant must file an "Offer to Lease" with the proper BLM Office containing a description of the desired property and accompanied by a $10 filing fee and payment of the first-year rental. However, the lease is not issued until the BLM Office determines that (1) no other lease applications are pending on the parcel, and (2) there are no State or Federal restrictions, such as environmental restrictions, on the use of the parcel. If any restrictions are found to exist, the BLM Office may decide to issue the lease on a "subject to" basis—for example, the lease could be restricted so as to preclude surface occupancy, thereby making it difficult or impossible to carry on oil and gas exploration activities.

During 1976, approximately 600 to 700 lottery leases were posted each month in the BLM Offices located in the various States where Melbourne operated. Each lease description provided only the serial number and location and size of the parcel. This information did not enable a prospective applicant to distinguish readily a particular lease from any other lease in terms of its proximity to producing oil and gas properties, its estimated value or desirability, or its appeal to other prospective applicants. Thus, a layman having no oil and gas or real estate experience and lacking familiarity with the mechanics of the lottery lease system would have been severely hampered in his attempts to acquire valuable lottery leases. Further complicating matters was the fact that the prospective applicant only had 5 working days to research the posted leases, determine which ones were worth filing on, and prepare and file the necessary lease applications.

### Services Provided by Melbourne Under Advisory and Service Agreement

Under the terms of the advisory and service agreement, Melbourne agreed to select and file applications on "approximately 600" unspecified leases on behalf of petitioner and the co-participants for a fee of $40,300. Petitioner's share of this fee was $10,075. The filings were to take place over a period of 6 months ending on December 31, 1976, at a rate of approximately 100 per month. Melbourne notified each successful client as soon as the results of the public drawings were available. If the client decided to acquire the lease, Melbourne paid the required first-year rental to the proper BLM Office on his behalf and thereafter billed him for the amount plus the cost of the $10 filing fee which had been tendered with the application.

Melbourne promoted these services as an integrated program which it referred to as Federal Oil Land Acquisition Program "A" (program A). In a confidential memorandum given to petitioner, Melbourne explained the mechanics of program A and described in detail the nature of the services to be performed on behalf of program participants:

GENERAL: Melbourne Concept, Inc. proposes to offer to certain of its clients services in connection with their acquisition of Federal Oil and Gas Leases. Two programs are offered herein. The non-bracketed figures, i.e.

$40,300 represent a program constituting approximately 600 applications. The bracketed figures, i.e. $67,180 represent a program constituting approximately 1000 applications.

TERM AND COST: The term and cost of the services Melbourne proposes to offer per one-half unit shall be for one year at a cost of $40,300 ($67,180) and shall include a minimum of 50 (80) filings per month. A payment of $10,500 ($17,504) shall be due upon commencement of the program. The remaining $29,800 ($49,676) [will] be due on December 1 regardless of the participant's commencement date. Further, no commitment in this program shall be accepted after November 25 of any calendar year.

SERVICES: The services to be performed by Melbourne include, but are not limited to:

1. The recommendation by Melbourne of "open" lands which can be acquired at the participant's expense ($1.00 per acre for the first year's rental) during the initial months of the program.

2. The evaluation of Federal Lands within its areas of interest.

3. The selection from those evaluated of those deemed to be acceptable for filing.

4. The monthly preparation of applications on leases selected as in (3) above.

5. The payment of all fees and the advance rental where a participant is awarded the first priority on a lease. In the event of this occurrence the participant will reimburse Melbourne within 15 days for the rental.

6. The timely delivery, on a best efforts basis, of all applications to the proper land office.

7. The notification of each individual winner plus the publication of a monthly newsletter so that all participants will be kept abreast of both winnings and sales.

8. The furnishing of a detailed plat of each lease awarded to the successful applicant showing his lease, adjacent lease ownership, and any pertinent drilling or production information.

FINANCING: You will note that the $40,300 ($67,180) cost of the program is broken into two payments: An initial payment of $10,500 ($17,504), and a payment of $29,800 ($49,676) due on December 1. Many of our clients may find it advantageous to borrow sufficient funds to cover the second payment.

"PUT-OPTION" Melbourne will sell to each participant who so desires a "Put-Option" for the sum of $2,900 ($4,834). The premium for the "PUT-OPTION" for those who accept it is payable when the participant enters the program. The put-option entitles the client to sell to Melbourne for $27,800 ($46,343) an undivided 33⅓% interest in all leases acquired during the months of the FOLAP "A" Program.

Attached to the memorandum was a projection of the after-tax profits (losses) to be derived by participants:

FEDERAL OIL LAND ACQUISITION PROGRAM "A"

| Michigan client (50% bracket) | 600 Applications 640 acres | 1000 Applications 640 acres |
|---|---|---|
| 1. Cost of service ...................... | $40,300 | $67,180 |
| 2. Cash outlay: | | |
| 3.   Downpayment ...................... | 10,500 | 17,504 |
| 4.   Repurchase agreement ........... | 2,900 | 4,834 |
| 5.   Landmen cost ...................... | 878 | 1,464 |
| 6.   Capital cost $17/lease ........... | 17 | 17 |
| 7.   Lease rental $0.50/acre ......... | 320 | 320 |
| 8.   Total cash outlay ................. | 14,615 | 24,139 |
| 9. Bank loan 12/1/76 | 29,800 | 49,676 |
| 10. Income tax deduction ............. | 40,300 | 67,180 |
| 11.  Lease rentals ...................... | 320 | 320 |
| 12. 1976 Total deduction .............. | 40,620 | 67,500 |
| 13. 1976 Tax savings at 52.3% ...... | 21,244 | 35,303 |
| 14. 1976 Tax profit (13 - 8) ......... | 6,629 | 11,164 |
| 15. 1977 Exercise repurchase ......... | 27,800 | 46,343 |
| 16. 1977 Total cash (14 + 15) ....... | 34,429 | 57,507 |
| 17. 1977 Loan repayment ............. | –29,800 | –49,676 |
| 18. 1977 Net cash ..................... | 4,629 | 7,831 |
| 19. Capital gain in 1977 .............. | 24,004 | 40,028 |
| 20.  Capital gain tax due 4/15/78 .. | 6,001 | 10,007 |
| 21. Net profit after tax ............... | (1,372) | (2,176) |
| 22. Cost per filing ..................... | (2.29) | (2.18) |

Note 1. Capital gains tax (line 20) can be reduced or eliminated by using any loss carryforward.

Note 2. Illustrations assume only 1 year of unsuccessful participation and do not project any future cash flow from overriding royalties.

Melbourne did not perform the advisory and filing services for its clients directly. Instead, it subcontracted the work out to Stewart Capital Corp. (Stewart), a company which has been engaged in the business of selecting and filing applications on leases of Federal oil and gas lands since 1963. Stewart performed these services for a number of clients, including those which it serviced indirectly through Melbourne.

One of the principal services provided by Stewart was the selection of the leases on which applications were to be filed. For this purpose, Stewart retained a staff of oil and gas landmen in the various States where the leased parcels were located. Each of these landmen was an independent professional with extensive knowledge of oil and gas activities within his

particular territory. At some point on or after the third Monday of each month, each landman obtained the list of available lottery leases from the BLM Office or Offices in his territory and plotted the locations of the leases on special "oil maps." This enabled him to determine which leases were located near areas where oil and gas drilling or exploration was taking place, or where other leases had recently been sold. On the basis of this information, he assigned an estimated dollar value to each lease representing the amount which a third party might pay for an assignment of the lease in an arm's-length transaction.

Stewart then fed these estimated values into a computer which was programed to estimate the number of applicants who would apply for each lease. The program took into account not only the estimated value of the lease, but also a variety of other factors which Stewart, through its years of experience, had determined would impact on the number of potential applicants. The computer then divided the estimated value of each lease by the predicted number of applicants and ranked the leases according to these weighted values. In other words, the computer compared the value of each lease with the difficulty of winning it in order to determine which leases presented the best potential investments from the standpoint of a prospective applicant. The end result was a "merit ranking list" of all the available lottery leases.

Using this list, Stewart prepared and filed applications on the highest-ranking leases on behalf of each of its clients. Recognizing that its clients were not only competing against other applicants for the targeted leases, but also against each other, Stewart attempted to minimize this "internal" aspect of the lottery competition by refusing to service more than 250 clients at any one time. To speed up the filing process, Stewart obtained an authorization from each client to use a facsimile signature in order to complete the applications. Each application was then delivered, along with the $10 filing fee, to the appropriate BLM Office before the filing deadline expired.

In addition to advising Melbourne's clients with respect to lottery lease filings, Stewart also provided recommendations and filing services regarding available open-parcel leases.

Approximately 60 percent of Stewart's total costs of operation, exclusive of the cost of filing fees, were incurred in

preparing and filing the lease applications. The remaining 40 percent of the costs were attributable to such items as computer operation and maintenance, monthly updating of the computer program, landmen retainers, and tax advice.

A brochure published by Stewart and made available to petitioner indicated that, as of 1973, Stewart's clients were enjoying a success ratio of one lease acquired in every 260 applications, with an average estimated value of $10,000.

### Description of "Put Option" Offered by Melbourne

As part of its program A package, Melbourne offered each of its clients a "put option" which gave the client the right to require Melbourne to purchase, at a predetermined price for a specified period, an undivided one-third interest in any and all oil and gas leases acquired by the client under the program. The put option carried a separately stated premium and was embodied in a separate contract. The purpose of the put option was to insure that the purchaser would eventually receive some economic return in the event he was successful in obtaining either a lottery or an open-parcel lease. If a client purchased a put option, but failed to acquire any leases, the put lapsed and became worthless. In effect, the put option allowed the client to reduce his potential risk by bringing in Melbourne as a one-third partner.

On June 21, 1976, petitioner and the co-participants purchased a put option from Melbourne for $2,900. Under the terms of the option contract, Melbourne became obligated to purchase a one-third interest in any and all leases acquired by the holders of the option at a fixed price of $27,800, provided the option was exercised within 6 months and 1 day after the effective date of any acquired lease. Petitioner's 25-percent share of the option cost was $725.

### Payments Made by Petitioner in Connection With Program A

The total costs of participation in program A were as follows:

Advisory and service fee .............. $40,300.00
Charge for landmen's services ...... 878.00
Put option cost ......................... 2,900.00
Total ................................. 44,078.00

Petitioner's 25-percent share ......... 11,019.50

Petitioner paid the $11,019.50 amount by checks dated June 21, 1976, and December 30, 1976, in the amounts of $3,569.50 and $7,450, respectively.

The $878 charge for landmen's services was intended to cover any additional expenses which might be incurred by Melbourne in obtaining recommendations from landmen regarding a particular open-parcel or lottery lease.

### Results of Petitioner's Participation in Program A

From July through December of 1976, Stewart selected and filed applications on 600 separate and distinct lottery leases on behalf of petitioner and the co-participants. Of these applications, 599 were determined to be unsuccessful by December 31, 1976. The other application was determined to be successful in September 1976, whereupon petitioner and the co-participants were issued lottery lease W–57065 on a Wyoming parcel (the Wyoming lease). Petitioner's ownership interest in this lease was 25 percent.

On September 3, 1976, Stewart also filed an offer to lease on an open-parcel lease of Utah acreage with the BLM Office in Salt Lake City. The offer to lease form had been executed in blank by the participants at the beginning of the program. However, on April 5, 1977, the BLM Office completed its administrative review and determined that the lease would have to be issued with a surface occupancy restriction because the parcel was located in a scenic corridor of Interstate 70. This meant that oil and gas testing could only be accomplished by directional or slanted drilling from an adjacent tract. As a result, the application was abandoned and the lease was never issued to the participants.

During 1977, the participants exercised their put option and petitioner received $6,950 (25% × $27,800) from Melbourne in exchange for an assignment of a one-third interest in his share

of the Wyoming lease. Petitioner treated the proceeds as an amount realized in computing his gains and losses for the 1977 taxable year. On July 21, 1978, petitioner, Melbourne, and the co-participants assigned their interests in the Wyoming lease to the Apache Corp. for a total cash payment of $7,000 plus a 5-percent overriding royalty.

## Facts Pertaining to At-Risk Issues

On December 30, 1976, petitioner borrowed $7,450 from the Manufacturers National Bank of Detroit (Manufacturers) for the purpose of paying the second installment on the advisory and service fee. The 1-year loan was interest-bearing, unsecured, and recourse as to petitioner. A letter signed by petitioner and included in the loan documentation stated that the proceeds of the loan would be used solely to pay "investment advisory fees," and for no other purpose.

On December 22, 1976, Melbourne authorized its president, Frank Critelli, to negotiate and procure loans and/or letters of credit from Manufacturers and to provide security for such liabilities. On January 4, 1977, Melbourne arranged with Manufacturers to have 33 letters of credit issued in its behalf in the total amount of $718,325. These letters of credit were secured by an agreement entered into by Melbourne and Manufacturers on December 22, 1976, in which Melbourne gave the bank a security interest in a certificate of deposit purchased on December 30, 1976, in the amount of $586,275, and in all other of its property coming into the bank's possession. In addition to the certificate of deposit, Melbourne had $59,015 in a checking account and $132,050 in a savings account at Manufacturers as of December 31, 1976.

One of the letters of credit, No. 38543, was issued in petitioner's name for $6,950. It stated that it could be drawn on by petitioner only upon receipt of his sworn statement indicating that he had exercised his put option, and Melbourne had failed to honor its obligations under the option contract. However, if (1) Melbourne complied with the terms of the contract by purchasing a one-third interest in any acquired leases, or (2) petitioner elected not to exercise the option, or (3) petitioner did not acquire any leases under program A, he would never become entitled to the proceeds of the letter of credit.

In a standardized bank document dated December 30, 1976, and bearing petitioner's signature (hereinafter referred to as assignment of proceeds), petitioner agreed to assign to Manufacturers the proceeds of an unnamed letter of credit in the amount of $6,950 if and when he chose to draw on the letter of credit. The assignment of proceeds was intended to refer to the letter of credit which was subsequently issued in petitioner's name on January 4, 1977. The effect of the agreement was that Manufacturers would receive the $6,950 if, and only if, petitioner exercised his put option, Melbourne refused to honor the put, and petitioner thereafter drew on his letter of credit.

## Other Facts

On his 1976 Federal income tax return, petitioner deducted $10,075 as a miscellaneous itemized deduction, representing his share of the advisory and service fee paid to Melbourne. In his notice of deficiency, respondent determined that the fee was a capital expenditure under section 263 and disallowed the deduction.

### OPINION

During 1976, petitioner and two other individuals jointly participated in an investment program (program A) sponsored by Melbourne Concept, Inc. One of the objectives of program A was to secure for participants noncompetitive leases on Federal lands for the purpose of oil and gas exploration and development. For a basic fee of $40,300, of which petitioners' share was $10,075, Melbourne agreed to provide certain services through a subcontractor (Stewart Capital Corp.) which specialized in acquiring noncompetitive leases on behalf of its clients.

There are basically two types of noncompetitive leases: lottery leases and open-parcel leases. Lottery leases are those which have previously been issued and whose terms (generally limited to 10 years unless drilling or production has commenced) have expired. They are made available to the public under what is known as the simultaneous-filing system. Under this system, any person interested in applying for a lottery lease simply submits an application together with a $10 filing

fee to the Bureau of Land Management Office having jurisdiction over the parcel in question. Each applicant is limited to one application per lease. Once a month, the BLM Office holds a public drawing from among all the applications received on a particular lease, and issues the lease to the winning applicant upon receipt of the first-year rental fee.

Open-parcel leases, on the other hand, relate to parcels which have never been leased before, or which were previously made available as lottery leases but were not sought after by any qualified applicants. They are available on a first-come, first-served basis to any qualified applicant who walks into the BLM Office and files an offer to lease accompanied by the required filing fee and first-year rental. However, no lease is issued until the BLM Office completes an administrative review to ascertain whether there are any prior pending applications on the lease or restrictions on the use of the underlying acreage.

Under its agreement with petitioner and the co-participants, Melbourne was obligated to select and file approximately 600 lease applications during the latter half of 1976. The actual services were performed by Stewart. As of December 31, 1976, Stewart had filed exactly 600 applications on lottery leases. One of them was determined to be successful in September 1976, and the participants acquired a lease on a parcel of land in Wyoming. Stewart also recommended and filed an application on an open-parcel lease located in Utah, but that application was abandoned in 1977 because the BLM Office in Salt Lake City determined that the acreage was located in a scenic corridor of Interstate 70 and could only be leased with a restriction prohibiting surface occupancy.

In addition to the $40,300 advisory and service fee, the participants also paid $2,900 to Melbourne for the purchase of a put option. Under the terms of the option contract, Melbourne was obligated, at the participants' option, to purchase from them an undivided one-third interest in "any and all" leases acquired by the participants for the predetermined price of $27,800. If no leases were acquired, or if the participants chose not to exercise the option, it lapsed and became worthless. In 1977, the participants exercised their option and sold a one-third interest in the Wyoming lease to Melbourne

for $27,800. In 1978, the co-owners of the lease sold it to a third party for $7,000 plus an overriding royalty.[2]

The issue in this case concerns the deductibility of the $40,300 advisory and service fee paid by the participants. Petitioner deducted his share of the fee in full on his 1976 return, and now claims that the deduction is allowable under either section 162 or 212. Alternatively, he contends that 99.83 percent of the fee is deductible as a loss on transactions entered into for profit under section 165. He arrives at this percentage by dividing the number of unsuccessful lottery lease applications (599) by the total number of such applications (600). Respondent, on the other hand, contends that the entire fee must be capitalized as a cost of acquiring the single lottery lease. He further contends that the loss claimed by petitioner is not evidenced by closed and completed transactions, as required by section 1.165–1(b), Income Tax Regs., because he acquired a valuable lease under the program and was also protected from loss by the put option. By way of amended answer, respondent has also injected section 465 into the dispute, contending that program A is an at-risk activity under section 465(c)(1)(D), and that petitioner was only partially at risk (within the meaning of sec. 465(b)) with respect to his investment therein. We will address petitioner's arguments in connection with section 212 first.[3]

### 1. Deductibility Under Section 212

Section 212 allows a deduction for ordinary and necessary expenses paid or incurred for (1) the production or collection of income, or (2) the management, conservation, or maintenance

---

[2]There are strong indications in this record that many open-parcel leases are, like the Utah lease, considered to be worthless and are apparently available for the asking simply by paying the $10 filing fee and first-year rental. We suspect that the only reason Melbourne included open-parcel filings as part of the program A package was to insure that each participant would acquire at least one lease in the event that all of his lottery filings proved to be unsuccessful. This, in turn, guaranteed those participants who had purchased a put option of being able to recover well over one-half of their program investment in the following year by exercising the option and forcing Melbourne to become a one-third partner in a worthless lease.

[3]Petitioner makes only a passing reference to sec. 162 on brief, no doubt because there is no evidence whatsoever to suggest that the claimed deduction was incurred in the course of an ongoing trade or business carried on by petitioner. We are satisfied that the requirements for deductibility under sec. 162 have not been met in this case, and we so hold.

of property held for the production of income. The term "income" is defined in section 1.212–1(b), Income Tax Regs., to include not only income realized in the current taxable year, but also income expected to be realized in subsequent years, including gains from the disposition of property. Qualifying expenditures include "fees for services of investment counsel, custodial fees, clerical help, office rent, and similar expenses paid or incurred by a taxpayer in connection with investments held by him," provided the expenses bear a reasonable and proximate relation to the production or collection of income from the property or to its management or upkeep. See sec. 1.212–1(g), Income Tax Regs.[4]

However, section 212 does not permit the deduction of expenses incurred in investigating, searching for, or acquiring new investment properties. *Contini v. Commissioner*, 76 T.C. 447, 452 (1981); *Frank v. Commissioner*, 20 T.C. 511, 514 (1953); *Beck v. Commissioner*, 15 T.C. 642, 670 (1950), affd. per curiam 194 F.2d 537 (2d Cir. 1952); *Weinstein v. United States*, 190 Ct. Cl. 437, 420 F.2d 700, 702 (1970). As we stated in *Contini v. Commissioner, supra* at 452, "a proprietary or possessory interest in an income-producing asset is a prerequisite to the deductibility of related expenditures under section 212(1) or section 212(2)." Expenses incurred in the preacquisition stage may constitute personal expenses under section 262 or capital outlays under section 263, depending on the circumstances. See sec. 211; sec. 1.212–1(e), (n), Income Tax Regs. Those which are directly related to the acquisition process, such as legal, accounting, brokerage, finder's and promoter's fees, must be capitalized as part of the cost of the asset. See sec. 1.263(a)–2, Income Tax Regs.; *Woodward v. Commissioner*, 397 U.S. 572, 576 (1970) ("ancillary expenses incurred in acquiring or disposing of an asset are as much part of the cost of [the] asset as is the price paid for it"); *United States v. Hilton Hotels*

---

[4]The regulation states as follows:

Sec. 1.212–1(g). Fees for services of investment counsel, custodial fees, clerical help, office rent, and similar expenses paid or incurred by a taxpayer in connection with investments held by him are deductible under section 212 only if (1) they are paid or incurred by the taxpayer for the production or collection of income or for the management, conservation, or maintenance of investments held by him for production of income; and (2) they are ordinary and necessary under all the circumstances, having regard to the type of investment and to the relation of the taxpayer to such investment.

*Corp.*, 397 U.S. 580, 584 (1970); *Vestal v. United States*, 498 F.2d 487, 495 (8th Cir. 1974); *Cagle v. Commissioner*, 63 T.C. 86, 96–97 (1974), affd. 539 F.2d 409 (5th Cir. 1976); *Estate of Boyd v. Commissioner*, 76 T.C. 646, 659 (1981); *Honodel v. Commissioner*, 76 T.C. 351, 366 (1981), on appeal (9th Cir. and 10th Cir., June 4, 1982); *Kimmelman v. Commissioner*, 72 T.C. 294, 304–305 (1979). The taxation of a particular payment depends on the nature of the services performed rather than their designation or treatment by the taxpayer. *Cagle v. Commissioner, supra* at 96; *Honodel v. Commissioner, supra* at 365.

Petitioner maintains that the advisory and service fee is allocable to essentially two different types of services: (1) Investment advice rendered in selecting the leases on which applications were to be filed, and (2) clerical and administrative services rendered in connection with the preparation and filing of the lease applications. Since he believes that both of these services fall within the categories of expenses identified in section 1.212–1(g), Income Tax Regs., he argues for full deductibility even though the services necessarily relate to investment properties (i.e., oil and gas leases) which have yet to be acquired. We disagree. In our judgment, the Melbourne fee is best viewed as a cost of acquiring the single lease which program A yielded for the participants, and must therefore be capitalized.

Melbourne promoted program A as a package deal whose principal aim, apart from generating certain tax benefits, was the acquisition of noncompetitive oil and gas leases for program participants. The program was designed to maximize the chances of a participant's acquiring one or more valuable leases through the filing of applications on a large number (either 600 or 1,000, depending on the program option selected) of lottery leases carefully culled from the lists of available leases posted in the BLM Offices. The selection process, which petitioner refers to as the "investment advisory" phase of the program, involved essentially three steps. First, professional oil and gas landmen employed by Stewart analyzed each posted lease and gave it an estimated value based on its proximity to producing wells and certain other information. Second, these values were fed into a sophisticated computer program which Stewart had developed for the purpose of predicting the number of persons who could be expected to

apply on a given lease with a given estimated value. Third, each lease was assigned a numerical value equal the estimated value divided by the number of predicted applicants. The leases were then ranked in descending order according to these weighted values. From this "merit ranking list" of available lottery leases, Stewart chose the highest-ranking leases each month as filing targets for its clients. By selecting the leases in this manner, Stewart sought to insure that each of its clients achieved the optimal "spread pattern" for his particular salvo of applications, with the overall aim of maximizing the client's return on investment through the acquisition of valuable leases.

The other phase of the program involved the preparation and filing of the applications, which petitioner characterizes as "clerical and administrative services." As in the case of the selection process, Stewart had complete responsibility in this area, and no client involvement was required.

We think it evident from the description of these professional services and the design of program A that Stewart was not in the business of providing investment advice or clerical assistance, but rather was in the business of acquiring oil and gas leases for its clients. The nature of the lottery lease system is such that a layman with no oil and gas or real estate experience must have some form of expert assistance in order to gauge the relative values of the available leases and select his targets intelligently and efficiently. In addition, the time-consuming process of preparing and filing the large number of applications needed to combat the odds against hitting any single lease would seem to pose a formidable challenge to the average investor with limited time and resources. This is particularly true when one considers that the investor has only 5 business days each month to research the posted leases, select his targets, and prepare the necessary applications. Rather than struggle with these obstacles himself, petitioner decided to retain a professional middleman to acquire the leases for him. Since the firm touted a success rate of one lease acquired for every 260 applications filed on behalf of its clients, petitioner obviously did not realistically expect to hit

on all or even many of the roughly 600 applications he contracted for.[5] Rather, he was clearly hoping to acquire at least one and perhaps several valuable lottery leases. Under these circumstances, we think the various services performed by Stewart must be regarded as necessary and integral steps in the process of acquiring the Wyoming lease, notwithstanding that a much larger number of leases were chosen as the initial targets.

In effect, we view the advisory and service fee in much the same light as a commission or finder's fee paid to an agent to locate and arrange the purchase of a parcel of real estate which conforms to his principal's specifications. The fact that the agent finds it necessary to scout a number of possibilities before settling on a suitable parcel does not alter the inherently acquisition-oriented nature of his services, and this is particularly true where only one fee is charged for his efforts. This principle is illustrated in *Estate of Boyd v. Commissioner, supra* at 660–661, where one of the issues concerned the deductibility of a management fee paid by a limited partnership to its corporate general partner for services allegedly rendered in evaluating a number of oil and gas properties. The partnership ultimately purchased an interest in only one of these properties. The taxpayer argued that the portion of the fee allocable to evaluation services was deductible under sections 707(c) and 162 as an ordinary and necessary business expense. However, we observed that while the cost of the services may have been deductible by the general partner as an ordinary and necessary expense of *its* business, the payment for those services by the partnership had to be considered an investigatory and preacquisition cost of its interest in the oil and gas property. Similarly, in *Galt v. Commissioner,* 19 T.C. 892, 909–911 (1953), affd. in part and revd. in part on other issues 216 F.2d 41 (7th Cir. 1954), the taxpayer, who had hired an attorney to negotiate a lease of certain property he owned, attempted to deduct (under the forerunner of sec. 212) the portion of the fee claimed to be allocable to unsuccessful negotiations with a number of potential lessees. We found that

---

[5]It is not clear whether this statistic also reflects the results of open-parcel filings made on behalf of participants. If it does, then the odds of petitioner's acquiring a valuable lottery lease were even less than the promotional brochure represented.

.

the successful and unsuccessful efforts were inseparable, and the attorney's fee was indivisible, and thus required the entire amount to be capitalized and amortized over the term of the lease.

The instant case, while not necessarily on all fours with the above, at least presents a closely analogous fact pattern. Instead of separate charges for each individual filing, Melbourne charged a single, unitary fee for all of its services. The large number of filings and the manner in which they were selected make it clear that they were not expected to be economically viable independent of one another. They were, instead, part of a collective economic effort designed to give the investor a much needed edge in playing the BLM lotteries, just as the hundreds of pellets in a shotgun shell combine to give the hunter an edge in bringing down a bird in flight. Thus, we think the entire fee is a capital outlay, and, for the reasons set forth below, we think petitioner's arguments for a current deduction are unconvincing.

Under petitioner's theory, the portion of the fee allocable to the so-called "investment advisory" services is deductible as investment advice under section 212 even though the services related to future or potential investment acquisitions. He cites as authority our opinion in *Honodel v. Commissioner, supra,* where we allowed the taxpayer-investors to deduct monthly retainer fees paid to an investment consulting firm (FMS) under section 212(2). The services they received consisted of periodic planning sessions during which FMS analyzed each client's investment goals and personal, financial, and tax status, and, on the basis of that information, proposed new investment programs and opportunities (principally tax shelter limited partnerships) which it felt matched the client's objectives and available resources. Generally, FMS was actively involved in negotiating the purchase of the investment and played a central role in the formation of the investment vehicle. Consequently, the firm charged an additional investment fee to clients who decided to invest in a particular project. The monthly retainer fee, by contrast, was payable regardless of whether the client decided to follow through on the FMS recommendations. We held that the additional investment fees paid by the taxpayers were nondeductible costs of acquiring their limited partnership interests, but we

permitted a current deduction for the monthly retainer fee under section 212(2) on the ground that the services rendered were in the nature of investment advice.

According to petitioner, the investment advice in *Honodel* concerned future or potential investments and is essentially no different from the services provided by Stewart in evaluating and selecting lease targets. However, there are significant factual differences between the two cases. In *Honodel*, the consulting firm shared an ongoing advisory relationship with its clients; it carefully monitored their investment objectives and financial situation; and, from time to time, it recommended new investment opportunities tailored to their individual needs. Since each client presumably had an existing pool of investment assets already committed to the production of income, advice directed at improving the yield on those assets, whether it was in the form of buy, sell, or hold recommendations, clearly qualifies as "investment counsel" within the meaning of section 1.212–1(g), Income Tax Regs. See, e.g., *Mallinckrodt v. Commissioner*, 2 T.C. 1128, 1148 (1943), affd. on other issues 146 F.2d 1 (8th Cir. 1945); *Bagley v. Commissioner*, 8 T.C. 130 (1947); *Vest v. Commissioner*, 57 T.C. 128, 148–149 (1971), affd. in part and revd. in part on other issues 481 F.2d 238 (5th Cir. 1973); *Picker v. United States*, 178 Ct. Cl. 445, 371 F.2d 486, 499 (1967). See also the discussion in *Contini v. Commissioner*, *supra* at 452 n. 2, and *Vestal v. United States*, *supra* at 495.

In this case, however, the alleged "investment advice"—the lease selection process performed by Stewart—was in substance nothing more than a complex in-house operation intended to facilitate the completion of a specific task: the acquisition of leases for program participants. Petitioner was completely divorced from the selection process; he simply paid his money and waited on the sidelines for the results of the monthly lotteries to come in. There is no evidence that either Melbourne or Stewart provided advice to petitioner regarding the management, disposition, or conversion of any preexisting property interest held for the production of income, and yet both the cases and the regulations make it clear that that is a prerequisite for an investment advice deduction.[6] Moreover,

---

[6]In *Contini v. Commissioner*, 76 T.C. 447, 452 (1981), this Court based its conclusion that a preexisting property right is necessary to support an investment advice deduction in part on

we note that the decision *to invest* in the Melbourne program was made by petitioner unilaterally without the advice of a paid investment counselor. Thus, we are satisfied that the facts of *Honodel* are far enough removed from those presented here to make it inapposite.

Finally, to support his argument concerning the deductibility of the portion of the fee allocable to "clerical and administrative" services (the preparation and filing of the applications), petitioner relies on two District Court cases, *Hagood v. United States*, 144 F. Supp. 782 (D. Wyo. 1956), and *Cranston v. United States*, an unreported case (D. Mont. 1977, 41 AFTR 2d 78–549, 78–1 USTC par. 9118). Both cases permitted deductions under sections 162 and 212 (or their predecessors) for filing fees and first-year rentals paid by individual taxpayers in connection with noncompetitive oil and gas lease applications. In *Hagood*, all but a few of the lease applications were successful; in *Cranston*, the taxpayers assigned their rights in the applications to oil companies before they were acted upon by the Government. It appears that the principal issue in both cases was the deductibility of the first-year rental payments, which this Court had previously held to be deductible as rent under the predecessor of section 162 in *Featherstone v. Commissioner*, 22 T.C. 763 (1954).[7] However, we did not address the deductibility of *filing fees* in that case, and the opinions in *Hagood* and *Cranston* contain no legal analysis on the specific question of whether such fees must be capitalized where the related application results in a lease acquisition. Moreover, neither *Hagood* nor *Cranston* involved an integrated lease acquisition program such as the one involved in the instant case. Thus, we do not view those cases as having any precedential value with regard to the issue before us.

To summarize, we hold that the advisory and service fee is

---

the fact that sec. 1.212–1(g), Income Tax Regs., refers to fees paid by the taxpayer "in connection with investments *held by him*." (Emphasis added.) See also *Weinstein v. United States*, 190 Ct. Cl. 437, 420 F.2d 700, 702 (1970).

[7] We note that in this case, first-year rentals on successful lease acquisitions were initially paid by Melbourne, who was in turn reimbursed by the client pursuant to a separate billing. Respondent has not disallowed a deduction for the rental fee paid by petitioner on the Wyoming lease.

capital in nature and no deduction may be taken under section 212.

## 2. *Deductibility Under Section 165*

We now turn to petitioner's argument that 99.83 percent of the advisory and service fee is deductible as a loss incurred on transactions entered into for profit—599 of them, to be precise. Petitioner asks us to view each lease application as an independent transaction for purposes of section 165(c)(2),[8] with the proper measure of the deduction being the pro rata portion of the fee allocable to each unsuccessful transaction, or 599/600 of the total amount.[9] Respondent takes the position that the Melbourne program must be viewed as an integrated whole, and since the program resulted in the acquisition of a lease, no loss was sustained during the taxable year. Further, respondent contends that the put option purchased by petitioner assured him of recouping a substantial portion of his investment in the following year and thus partially shielded him from loss.

In order to be deductible, a loss must be "sustained during the taxable year and not compensated for by insurance or otherwise." Sec. 165(a). This statutory requirement is amplified in section 1.165–1(b), Income Tax Regs., which provides that the loss must be evidenced by closed and completed transactions and fixed by identifiable events. It also states that the loss must be "bona fide" and that "substance and not mere form shall govern in determining a deductible loss."

In applying these tests, it is crucial to identify the relevant "transaction" to which section 165(c)(2) refers. This is a factual question which can only be answered on a case-by-case basis. Consistent with our reasoning on the preceding issue, we think that the Melbourne program must be viewed as an integrated

---

[8]We note that respondent concedes that petitioner would be able to deduct his investment under sec. 165 if he had failed to acquire any leases under the program. See Rev. Rul. 71–191, 1971–1 C.B. 77.

[9]It would seem that under petitioner's theory, the proper fraction to be applied in determining the amount of the deductible loss would be 599/601, since Melbourne also filed an application on an open-parcel lease which was not abandoned until the following year. If the rationale for this omission is that the open-parcel application was not a profit-motivated transaction, we would be inclined to agree. See our discussion at note 2 *supra.*

program designed to acquire at least one, and possibly several, leases for participants by filing a large cluster of applications on strategically selected lease targets. The nature of the lottery system is such that no participant was in a position to make a realistic appraisal of his return on investment until all the results of the lotteries were in. In the meantime, one would hardly expect to find a participant reeling in horror each time he learned that a particular application had failed to hit paydirt. Thus, when we apply the "substance over form" mandate of the regulation to these facts, we are drawn inexorably to one conclusion: that the relevant transaction is petitioner's investment in the program, and the determination of whether he sustained a loss on that transaction must be based on *overall* program performance measured by reference to the aggregate of the lease applications.[10] To hold otherwise would simply disregard the realities of the situation.[11]

Having identified the relevant transaction, the question now becomes whether it was closed and completed by the end of 1976. The answer is clearly no. During 1976, petitioner and the co-participants were successful in acquiring a lottery lease on a Wyoming parcel which was sold in 1978 for $7,000 plus a 5-percent overriding royalty. In addition, because they acquired an interest in at least one lease and had hedged their bets by

---

[10]Cf. *Smith v. Commissioner*, 78 T.C. 350, 390–391 (1982), where we held that, in determining whether the taxpayers could deduct losses when they closed out the loss legs of a number of commodity tax straddles, the relevant "transaction" for purposes of sec. 165(c)(2) was not each separate leg comprising a particular scheme of straddle trading, but rather the scheme itself, viewed in the aggregate as a single, prearranged sequence of trading.

[11]Petitioner argues that our opinion in *Larsen v. Commissioner*, 66 T.C. 478 (1976), calls for a contrary conclusion. In that case, the taxpayers incurred various expenses in attempting to negotiate oil and gas leases on specific parcels of land located in two large areas. They were successful in obtaining leases from some landowners but not from others. The Commissioner argued that the expenses allocable to the unsuccessful lease attempts had to be capitalized as part of the cost of the successful acquisitions. We disagreed and allowed a deduction for the expenses under sec. 165, observing that "Each lease sought was a separate and severable transaction covering specific acreage, entered into or sought to be entered into between [the taxpayers] and the owner of such acreage." 66 T.C. at 483.

The facts of *Larsen* are considerably different from those presented here, and, as stated in the text of this opinion, the determination of the relevant transaction for sec. 165 purposes is a strictly factual inquiry. Our analysis of this record convinces us that to view the various lottery lease applications as separate and independent transactions would be totally inconsistent with the substance of the Melbourne lease acquisition program, as evidenced by its purpose, design, and operation. Therefore, we decline to extend the rationale of *Larsen* to this situation.

purchasing a put option, they also gained the right to force Melbourne to purchase a one-third interest in the lease for the prearranged price of $27,800, of which petitioner's share was $6,950. To put these facts in context, in a year in which petitioner claims to have suffered a loss equal to 99.83 percent of his total investment, he managed to end up with (1) a 25-percent interest in a valuable oil and gas lease, and (2) the right to sell one-third of that interest to a third party at a price roughly equal to 63 percent of his total out-of-pocket costs (including the cost of the put option). Under these circumstances, and viewing the Melbourne program for what it is, i.e., an integrated lease acquisition program, we hold that the loss claimed by petitioner was neither bona fide nor evidenced by a closed and completed transaction as required by the regulation. Accordingly, no portion of the advisory and service fee is deductible under section 165(a).

Since we have decided that the entire fee is a capital expenditure, we need not address the at-risk issues raised by respondent in his amended answer. However, in the interests of clarity we have made certain findings of fact concerning these issues in order to provide a more accurate and comprehensive picture of how the Melbourne program operated.

To reflect the foregoing,

*Decision will be entered for the respondent.*