T.C. Memo. 2002-276


UNITED STATES TAX COURT


FRGC INVESTMENT, LLC, JAMES P. MEHEN, TAX MATTERS PARTNER,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5443-01.                    Filed October 31, 2002.


<u>Stephen E. Silver</u> and <u>Jason M. Silver</u>, for petitioner.

<u>Michael L. Boman</u> and <u>James E. Cannon</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent sent a Notice of Final Partnership Administrative Adjustment (FPAA) for 1997 and 1998 to FRGC Investment, LLC (FRGC).  James P. Mehen (petitioner), the designated tax matters partner for FRGC, filed a timely petition for readjustment with the Court.  The issues for decision are: (1) Whether FRGC's expenses in 1997 are deductible as an

abandonment loss under section 165(a) and (2) whether FRGC is entitled to deduct $189,447 in other expenses for 1998.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

FRGC is an Arizona limited liability company whose principal place of business was Flagstaff, Arizona. In May 1997, FRGC was formed to engage in predevelopment activities to acquire undeveloped real estate. The private placement memorandum materials for FRGC provided that any property or work product acquired would be contributed to a subsequently established entity, Flagstaff Ranch Golf Club, LLC (Flagstaff Ranch), for which FRGC's investors would receive membership interests in Flagstaff Ranch in an amount equal to those interests held in FRGC. Flagstaff Ranch was organized for the purpose of developing the property to include a golf course, community center, clubhouse, and residential lots for custom homes.

FRGC's managing partner was FR Management, LLC (FR Management), which was wholly owned by petitioner and his wife, Susie Mehen. FRGC's operating agreement provided that FRGC would pay FR Management $10,000 per month for management fees and $13,000 per month for overhead expenses. FRGC also paid Susie

Mehen $4,000 per month from August 1997 through June 1998 for marketing services.

Petitioner was president of Peyton Community Builders (PCB), a residential and commercial building construction company, during all relevant times. Previously, petitioner had been president and chairman of the Del Webb Commercial Properties Division, a land development company. In 1987, petitioner was involved in developing Forest Highlands, an upscale golf community located in the Flagstaff area.

Subject Property

The subject property was 404 acres of undeveloped land with a mix of dry lake bed, steep hillsides, and pine and aspen forests. It offered scenic views of the San Francisco Peaks and the city of Flagstaff. The dry lake was formed by volcanic activity over 1,000 years ago.

The property was owned by Cherry Properties, LLC (Cherry). Cherry was owned by Rex and Ruth Maughan, who acquired the subject property in 1994 from the Resolution Trust Corp.

Ronald Walker (Walker) was Rex Maughan's real estate broker. As part of his due diligence, in or before 1994, Walker met with the Coconino County planning director and reviewed the 1983 Coconino County Board of Supervisors minutes (1983 minutes). Walker discovered that the subject property was zoned for 1,596 residential units, a golf course, a school, and commercial

buildings.  Walker was assured by the Coconino County planning director that, although the current Zoning Department probably would not allow 1,596 units to be built on the property, locating a golf course in and around the dry lake area of the property would not present a problem.

Real Estate Purchase Agreements

On December 29, 1995, PCB or its nominee entered into a real estate purchase agreement (1995 purchase agreement) with Cherry for the purchase of approximately 240 acres of the subject property.  Petitioner intended that once FRGC was formed, FRGC would become PCB's nominee for the purchase agreement.

PCB deposited $25,000 with First American Title Co. to open escrow on the real estate transaction.  On March 14, 1996, PCB advised Cherry of objections to numerous survey and other title report exceptions for the subject property.  On April 15, 1996, escrow for the 1995 purchase agreement was canceled.

On August 14, 1996, PCB entered into a second real estate purchase agreement (1996 purchase agreement) with Cherry for the purchase of the entire 404 acres of subject property.  The sale also included Cherry's interest in the Flagstaff Ranch Water Co. PCB deposited $5,000 with First American Title Co. to open escrow on the real estate transaction on August 30, 1996, and deposited an additional $20,000 on November 26, 1996.  The 1996 purchase agreement required closing escrow on or before December 31, 1997.

The 1996 purchase agreement contained several contingencies, including approval by the Coconino County Board of Supervisors (Coconino County Board) for final plat and zoning. The agreement also provided that, if the buyer failed to close escrow for any reason, the buyer agreed to provide the seller with copies of any and all plans, engineering, plats, studies, surveys, and the like, if requested by the seller.

Petitioner presented a general development plan report (1997 plan) for the property to the Coconino County Board in August 1997. The 1997 plan was a complete zoning change from the zoning approved in the 1983 minutes. Petitioner planned to present the zoning request for the property to the Coconino County Board at a November 17, 1997, board hearing. Several weeks prior to the scheduled board hearing, Walker met with Paul Babbitt (Babbitt), head of the Coconino County Board. Babbitt indicated that he would oppose the zoning request as a result of a groundswell of protest from the community against development of 260 acres of dry lake area within the subject property. On November 17, 1997, petitioner met with Babbitt, another county supervisor, and a county attorney before the hearing was to begin. Petitioner was told "in no uncertain terms" that the zoning request did not have the votes to pass. Petitioner immediately requested an extension of the December 31, 1997, escrow deadline from Walker, who rejected the extension because the property had been "tied up"

for a significant period and because it was clear to Walker that petitioner was not going to obtain the requested zoning approval. Petitioner withdrew the zoning request after the hearing but before a vote was taken.

Walker began to market the property to other major developers after the November 17, 1997, meeting, as he expected petitioner to cancel escrow on the property. Petitioner contacted Joseph Janas (Janas), FRGC's certified public accountant, a few days after the hearing and told Janas that the real estate transaction would not go forward. Petitioner then instructed Janas to do a final accounting to determine how much cash in the partnership was available to distribute to the investors.

PCB and Cherry executed mutual cancellation instructions for the 1996 purchase agreement to the escrow company on December 29, 1997. The escrow company refunded the $25,000 in earnest money to PCB upon cancellation of the escrow. At the time that PCB and Cherry canceled escrow, petitioner did not attempt to renegotiate a new purchase agreement for the subject property.

Sometime in early January 1998, Walker approached petitioner and suggested new terms for the purchase that would be acceptable to Rex Maughan. The terms included a nonrefundable payment of $150,000, an increase in the purchase price from $5.25 million to $5.775 million, closing in 6 months with no contingencies, and

sale of one-half of Cherry's interest in the Flagstaff Ranch Water Co. instead of Cherry's full interest pursuant to the 1996 purchase agreement.

Petitioner and Walker prepared an offer and submitted it to Rex Maughan for approval. Petitioner sent a letter to FRGC's investors in early January, calling for a meeting on January 12, 1998, to vote on whether to proceed with the new purchase agreement. FRGC's operating agreement provided that more than one-half of the 50 outstanding partnership units had to agree to continue with the partnership. Although 16 units voted for redemption of their interests in FRGC, 34 units voted to continue with the partnership. Each redeemed unit received $11,000, which was $14,000 less than what was paid for the unit.

FRGC and Cherry executed a new real estate purchase agreement (1998 purchase agreement) on January 15, 1998. Flagstaff Ranch issued its private offering memorandum on February 10, 1998. Cherry conveyed the subject property directly to Flagstaff Ranch on June 29, 1998, and the parties closed escrow on June 30, 1998.

General Development Plans

In March 1999, a new general development plan report (March 1999 plan) was presented to the Coconino County Board that substantially complied with the zoning approved in the 1983 minutes. The Coconino County Board approved some of the March

1999 plan, but rejected the golf course placement in the middle of the dry lake area.  In December 1999, a new general development plan report (December 1999 plan) was presented to the Coconino County Board that encompassed a land swap with Bob Simple (Simple), who owned land adjacent to the subject property. Simple traded 250 acres of his property for the dry lake caldera and 36 acres of developable sites.  Simple then sold the dry lake caldera to the Grand Canyon Trust, and it eventually became the property of the Federal Government under control of the Coconino National Forest.

FRGC's Partnership Returns

On its 1997 Form 1065, U.S. Partnership Return of Income, FRGC reported interest income of $14,095 and "other deductions" of $669,126.  The claimed deductions consisted of the following:

| | |
|---|---|
| Management and supervision | $158,000 |
| Marketing expense | 104,851 |
| Office and overhead | 188,000 |
| Course design | 23,620 |
| Engineering | 61,435 |
| Environmental fees | 26,111 |
| Hydrology | 2,582 |
| Land planning fees | 24,741 |
| Zoning fees | 19,901 |
| Travel | 2,758 |
| Other fees and expenses | 10,000 |
| Land acquisition | 8,103 |
| Accounting fees | 5,850 |
| Planning fees | 31,372 |
| Amortization expense | 1,802 |
| Total | $669,126 |

Statement 2 of the 1997 partnership return contained the language "Activity Disposed of During 1997".

Prior to the organization of FRGC, PCB incurred overhead and management expenses for services rendered on behalf of FRGC. In June 1997, FRGC paid $110,000 for overhead expenses and $78,000 for management fees to reimburse PCB.

On its 1998 U.S. Partnership Return of Income, FRGC reported interest income of $6,921, dividends of $18, and "other deductions" of $189,447. The claimed deductions consisted of the following:

| | |
|---|---|
| Management and supervision | $60,000 |
| Marketing expense | 33,835 |
| Office and overhead | 78,000 |
| Auto expense | 868 |
| Office supplies | 1,846 |
| Postage and shipping | 2,184 |
| Travel | 6,972 |
| Accounting fees | 1,175 |
| Miscellaneous | 382 |
| Meals and entertainment | 667 |
| Amortization expense | 3,518 |
| Total | $189,447 |

None of the above expenses were incurred after June 30, 1998. FRGC paid $78,000 for overhead expenses incurred from January to June 1998. FRGC paid $60,000 to FR Management for January through June 1998 for management fees. Respondent sent the FPAA to petitioner on March 15, 2001, disallowing FRGC's "other deductions" in the amounts of $669,126 and $189,447 for 1997 and 1998, respectively.

OPINION

Respondent argues that FRGC did not sustain a deductible abandonment loss in 1997 and that all expenses claimed in 1997 and 1998 were capital in nature and are therefore not currently deductible. Petitioner acknowledges that a large percentage of the 1997 expenditures were nondeductible capital expenditures at the time they were made. However, petitioner argues that the expenses became deductible when the failure to obtain the requisite zoning changes resulted in cancellation of the 1996 purchase agreement. At trial, petitioner limited his arguments with respect to allowable deductions for 1997 to whether FRGC sustained an abandonment loss.

Petitioner also argues that the burden of proof should be shifted to respondent in accordance with the provisions of section 7491. We need not decide whether the conditions of section 7491 have been met by petitioner in this case, however, as the resolution of these issues does not depend on which party has the burden of proof. We resolve these issues on the basis of a preponderance of the evidence in the record, giving more weight to objective events than to subjective characterizations of intent.

Abandonment Loss

FRGC incurred expenses totaling $669,126 in 1997 in connection with its attempt to acquire suitable property for

development by Flagstaff Ranch.  After the unsuccessful zoning meeting in November 1997, PCB and Cherry executed mutual cancellation instructions for escrow on the 1996 purchase agreement.  On its 1997 return, FRGC deducted the $669,126 that was expended on the project as an abandonment loss under section 165(a).

Section 165(a) permits a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise.  The loss must be evidenced by a closed and completed transaction, fixed by identifiable events.  Sec. 1.165-1(b), (d), Income Tax Regs.  A loss incurred in a business, or in a transaction entered into for profit, and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed a deduction under section 165(a) for the taxable year in which the loss is actually sustained.  Chevy Chase Land Co. v. Commissioner, 72 T.C. 481, 487 (1979); sec. 1.165-2(a), Income Tax Regs.  The regulations also provide that the loss must be bona fide and that substance, not mere form, shall govern in determining a deductible loss. Sec. 1.165-1(b), Income Tax Regs.  To be entitled to an abandonment loss, a taxpayer must show:  (1) An intention on the part of the owner to abandon the asset and (2) an affirmative act

of abandonment.  United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398 (1927); A.J. Indus., Inc. v. United States, 503 F.2d 660, 670 (9th Cir. 1974); CRST Inc. v. Commissioner, 92 T.C. 1249, 1257 (1989), affd. 909 F.2d 1146 (8th Cir. 1990).  When the taxpayer has not relinquished possession of an asset, there must be a concurrence of the act of abandonment and the intent to abandon, both of which must be shown from the surrounding circumstances.  A.J. Indus., Inc. v. United States, supra.  Abandonment of an intangible property interest should be accomplished by some express manifestation, Citron v. Commissioner, 97 T.C. 200, 210 (1991), and "the Tax Court [is] entitled to look beyond the taxpayer's formal characterization." Laport v. Commissioner, 671 F.2d 1028, 1032 (7th Cir. 1982), affg. T.C. Memo. 1980-355.  That a partnership claimed an abandonment loss in its tax return for the year in issue is not sufficient to constitute an overt act.  See Equity Planning Corp. v. Commissioner, T.C. Memo. 1983-57.

Petitioner argues that the cancellation of escrow and petitioner's conversation with Janas were sufficient events to demonstrate abandonment.  Additional facts in the record, however, are inconsistent with a finding that FRGC abandoned the project in 1997.  Although petitioner testified that, as of November 17, 1997, he believed that the project was "dead", escrow on the 1996 purchase agreement was not canceled until

almost 6 weeks later, on December 29, 1997.  In addition, FRGC continued to pay fees to Susie Mehen for marketing and to FR Management for overhead for December 1997 and January 1998. Petitioner did not make a formal notification to FRGC's investors that the project or partnership would be abandoned in 1997.  In fact, petitioner did not meet with the investors until early January 1998, when he required their approval to enter into a new purchase agreement with Cherry.

Petitioner relies upon our decision in Chevy Chase Land Co. v. Commissioner, supra, in which we allowed an abandonment loss for the costs of negotiating a prospective long-term lease on an unimproved tract of land and for the costs of an unsuccessful attempt to rezone the land.  The rezoning was inextricably tied to the lease transaction and was limited to the construction of a specified type of department store for the lessee.  Id. at 488. When the rezoning effort failed, the lessee exercised its rights and terminated the entire transaction.  The taxpayer in Chevy Chase Land Co. regarded the future commercial development of the area as foreclosed, and, because the rezoning efforts had been so specific, none of the items (except a topographical map) acquired in the course of rezoning were thought to have any continuing value once the lease was terminated.  The facts of Chevy Chase Land Co. are distinguishable from the instant case, however, because FRGC was successful in obtaining a new purchase agreement

just 2 weeks after the cancellation of escrow on the 1996 purchase agreement.

Although a remote possibility of future use does not necessarily preclude abandonment, Citizens Bank of Weston v. Commissioner, 252 F.2d 425 (4th Cir. 1958), affg. 28 T.C. 717 (1957), we cannot ignore the language in section 1.165-1(b), Income Tax Regs., that requires that substance, not mere form, shall govern in determining a deductible abandonment loss. In substance, FRGC's sole business purpose was to engage in predevelopment activities to acquire property for Flagstaff Ranch. Although the unfavorable November 1997 zoning meeting and cancellation of escrow on the 1996 purchase agreement slowed FRGC's progress, they were not a bar to prevent FRGC from signing an agreement to acquire the property in early January 1998. An otherwise abandoned expenditure, if part of an integrated plan that is implemented, is not an abandonment loss under section 165(a). Nicolazzi v. Commissioner, 79 T.C. 109, 132 (1982), affd. 722 F.2d 324 (6th Cir. 1983). Indeed, petitioner withdrew the zoning request prior to a vote at the November 1997 board meeting, which indicates that he did not want to foreclose the opportunity to resubmit the request at a later meeting.

Although petitioner would have us ignore the realities of what transpired 2 weeks later, we decline to do so. Instead, we view the 1995 and 1996 purchase agreements that were entered into

between PCB and Cherry as steps in FRGC's continuing efforts to acquire the subject property. FRGC's expenses in 1997 were incurred in negotiating the purchase agreements and in settling the contingencies and were directly related to acquiring suitable property for Flagstaff Ranch.

Our holding is consistent with the decision of this Court in Nicolazzi v. Commissioner, supra, in which the taxpayer participated in a lottery program to acquire leases on Federal lands for oil and gas exploration and development. The taxpayer filed applications on approximately 600 leases and was successful in obtaining a lease. After applying the "substance over form" mandate of the regulations to the facts, we concluded that the relevant transaction was the taxpayer's investment in the lottery program and that whether he sustained a loss was measured by reference to the aggregate of the lease applications. "To hold otherwise would simply disregard the realities of the situation." Id. at 131. Accordingly, we held that no portion of the fee that was paid for the lottery program was deductible as an abandonment loss, because the taxpayer acquired an interest in a valuable lease and did not sustain a bona fide loss on his investment during the taxable year.

FRGC entered into a new purchase agreement with Cherry on January 15, 1998, only 2 weeks after the cancellation of the 1996 purchase agreement. Although we do not dispute petitioner's

claim that, between November 17 and December 31, 1997, he did not renegotiate an agreement to purchase the property, FRGC's execution of a new purchase agreement on January 15, 1998, is inconsistent with its contention that the project was abandoned in 1997. At trial, petitioner stressed the difference in material terms of the 1998 purchase agreement. However, FRGC acquired the same 404 acres of property for which it bargained in the 1996 purchase agreement. The increase in purchase price and decrease in interest obtained in the Flagstaff Ranch Water Co. did not appear materially to affect FRGC's ability to enter into a new purchase agreement to acquire the property for ultimate development by Flagstaff Ranch.

As additional evidence that the project was abandoned in 1997, petitioner contends that the general development plan report that was approved for the project in December 1999 was substantially and materially different with respect to cost, ownership, acreage, and design than the original zoning in the 1997 plan, which petitioner presented in November 1997. However, we are not persuaded that changes in the development plans that were made in 1999 prove that the entire project was abandoned in 1997. We are also mindful that, in the land development and construction arena, extra expenses due to errors in planning or design are part of the costs that the builder must bear. See Haspel v. Commissioner, 62 T.C. 59 (1974); Driscoll v.

Commissioner, 147 F.2d 493 (5th Cir. 1945). As the Court of Appeals noted in quoting the Tax Court in Driscoll v. Commissioner, supra at 494:

> "acceptance of petitioner's theory would result in a deductible loss in practically every construction project. Common experience tells us that no construction job is carried out with such perfection that some material, because of error, mistake, or even slight change in design, is not removed and therefore does not remain a part of the completed structure. Such expenditures are, we think, clearly a cost of construction."

Likewise, the additional costs incurred by FRGC for changes that were made to the 1997 plan were a part of the development costs for the property and the project.

In substance, the 1996 purchase agreement was merely a step in FRGC's continuing and successful attempts to acquire the subject property for Flagstaff Ranch. Accordingly, we conclude that FRGC did not sustain a deductible abandonment loss in 1997.

1998 Expenses

FRGC deducted $189,447 in other expenses on its 1998 return. Respondent disallowed FRGC's claimed deductions in 1998, because they were not ordinary and necessary but were capital in nature.

Section 162(a) permits a deduction for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Sec. 162(a). No current deduction is allowed for a capital expenditure. Sec. 263(a)(1). The regulations provide generally that "The cost of acquisition

* * * of * * * property having a useful life substantially beyond the taxable year" is a capital expenditure. Sec. 1.263(a)-2(a), Income Tax Regs. The same expenditure that may be deductible in one setting might be capitalized in another, if it is incurred in connection with the acquisition of a capital asset. Commissioner v. Idaho Power Co., 418 U.S. 1, 13 (1974); Ellis Banking Corp. v. Commissioner, 688 F.2d 1376, 1379 (11th Cir. 1982), affg. in part and remanding in part on another ground T.C. Memo. 1981-123.

Petitioner recognizes the applicability of the "process of acquisition" test in this case to decide whether expenditures are currently deductible or whether they must be capitalized. See Honodel v. Commissioner, 76 T.C. 351, 365 (1981), affd. 722 F.2d 1462 (9th Cir. 1984). The process of acquisition test focuses on the direct relationship between the cost and the acquisition, so that costs originating in the process of acquiring a capital asset are considered capital expenditures. Woodward v. Commissioner, 397 U.S. 572 (1970); Lychuk v. Commissioner, 116 T.C. 374, 390 (2001).

In applying the process of acquisition test to the facts of this case, we analyze what FRGC was attempting to acquire when it incurred its expenses in 1998. FRGC's operating agreement and private placement materials specifically state that FRGC's sole business purpose was to engage in predevelopment activities to acquire suitable property for Flagstaff Ranch. FRGC and Cherry

entered into a purchase agreement in January 1998 for the 404-acre subject property. Cherry conveyed the subject property directly to Flagstaff Ranch on June 29, 1998, and the parties closed escrow on June 30, 1998. All expenses incurred by FRGC in 1998 were directly connected to closing escrow on the subject property. In fact, FRGC did not incur any of the expenses in issue after June 30, 1998.

Partnership interests are capital assets pursuant to section 741. Citron v. Commissioner, 97 T.C. at 213; La Rue v. Commissioner, 90 T.C. 465, 483 (1988). Pursuant to Flagstaff Ranch's private placement memorandum, upon acquisition of the subject property, FRGC's investors would receive interests in Flagstaff Ranch equal to those held in FRGC. Although the expenses in issue that were incurred by FRGC in 1998 could be considered ordinary and necessary under different circumstances, the facts of this case reflect that these expenses directly related to acquiring property for Flagstaff Ranch. In substance, FRGC performed services and due diligence to acquire property that was contributed to Flagstaff Ranch in exchange for the partnership interests. FRGC was a mere conduit for Flagstaff Ranch's expenses in acquiring the undeveloped land.

Accordingly, because FRGC's investors received their property interest in Flagstaff Ranch in exchange for FRGC's contribution of the property and work product, all expenses that

were incurred by FRGC in 1998 are directly connected with the acquisition of a capital asset and therefore must be capitalized pursuant to section 263.

<u>Decision will be entered</u>

<u>for respondent.</u>