CORRA RESOURCES, LTD., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Corra Resources, Ltd. v. Commissioner
Docket No. 467-85
United States Tax Court
T.C. Memo 1990-133; 1990 Tax Ct. Memo LEXIS 133; 59 T.C.M. (CCH) 102; T.C.M. (RIA) 90133; March 14, 1990
Arthur H. Boelter and John J. White, Jr., for the petitioner. *134 Anne M. DiFonzo and John E. White, for the respondent. FAY
*234 MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: This case was assigned to Special Trial Judge Stanley J. Goldberg pursuant to section 7443A(b)(4) of the Internal Revenue Code of 1986 and Rule 180 et seq. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GOLDBERG, Special Trial Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Year Ended
Deficiency
September 30, 1975
$   8,905
September 30, 1976
$  33,131
September 30, 1977
$   5,900
September 30, 1978
$ 122,215
September 30, 1979
$ 119,911
September 30, 1980
$   1,780
By way of a Stipulation of Agreed Issues filed with this Court on October 24, 1988, and second and third stipulations of agreed issues both *135 filed on January 9, 1989, the parties have settled all issues, with the exception of a new issue raised by petitioner affecting its net operating loss for the taxable year ended September 30, 1981, which petitioner claims can be carried back to the taxable year ended September 30, 1978. This new issue, the only issue for decision in this case, is whether petitioner is entitled to a $ 77,500 abandonment loss deduction under section 165(a) for the taxable year ended September 30, 1981. Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioner, an accrual basis taxpayer, timely filed its Federal income tax returns for the taxable years ended September 30, 1978, through September 30, 1980. Petitioner, an Illinois corporation, had its principal place of business in Illinois when it filed its petition. On September 28, 1978, petitioner, formerly known as Corra Plumbing Company, leased coal mineral rights in Kentucky from Salem Minerals, Inc. (Salem), for a term of eight years (the Pikeville Quadrangle lease). At that time, petitioner contracted with Hurricane Mining Company (Hurricane) *136 to explore and mine the leased coal seams. Petitioner also arranged for Euran Energy (Euran) to act as its consultant and to manage the coal venture on behalf of petitioner as attorney-in-fact for a period of nine years. From February 1979, through February 1982, Euran periodically sent correspondence to petitioner regarding the investment. The lease between Salem and petitioner did not specify any formal termination method unilaterally available to petitioner. However, the contracts between petitioner and Hurricane, and petitioner and Euran, each allowed petitioner to terminate the agreement with 30-days written notice. Corra Plumbing Company was a small closely held corporation, owned completely by Ed Corra and his wife. The decision to invest in the Pikeville Quadrangle lease was made primarily by Mr. Corra, who generally made all of petitioner's investment decisions with the assistance of petitioner's comptroller, John Godinez, and, Leo Eatman, an independent C.P.A. Although Mr. Corra often sought Mr. Eatman's advice regarding petitioner's investment and tax matters, Mr. Eatman was not an owner, director, officer, or agent of petitioner at any time. Nor did Mr. Eatman *137 ever hold a power-of-attorney to act on behalf of petitioner. However, Mr. Eatman was well informed of petitioner's investments and prepared or supervised the preparation *235 of petitioner's financial reports and tax returns since 1970. In June 1980, petitioner sold its operating assets to Mr. Godinez and two other employees, and changed its name to Corra Resources, Ltd. After the sale, Mr. Corra and his wife remained the only two shareholders of petitioner. However, from that time forward, the only two people employed by petitioner were Mr. Corra and Mr. Corra's executive secretary. Also after the sale, Mr. Eatman occupied a close business relationship with Mr. Corra, and was given the responsibility for administratively handling the Pikeville Quadrangle investment. However, Mr. Eatman was still not given any authority to make decisions on behalf of petitioner. Only Mr. Corra had such authority, although Euran retained its power-of-attorney with regard to the Pikeville Quadrangle coal venture. Pursuant to the Pikeville Quadrangle lease, petitioner agreed to pay royalties for the coal mineral rights at a rate of $ 3.50 per ton of coal mined and 25 percent of the sales price per *138 ton of coal over $ 20. As an advance against such royalties, petitioner further agreed to pay Salem a $ 265,000 royalty for 1978 by no later than the execution of the lease. The lease also required petitioner to pay Salem a $ 265,000 minimum royalty per year for each year remaining on the lease. Paragraph 4(e) of the lease set forth the terms for payment of the advance royalties: (i) With respect to the payment required * * * [for 1978] * * * $ 26,500 in cash or by check and $ 238,500 by Non-Recourse Promissory Note and Pledge Agreement in the form attached hereto as exhibit B. (ii) With respect to the second royalty payment, such shall consist of $ 35,000 cash or check and the balance by Non-Recourse Promissory Note in the form attached hereto as Exhibit B. The said cash portion shall be prepaid as evidenced by a promissory note payable January 20, 1979. With respect to the third annual royalty payment, such shall consist of $ 35,000 cash and the balance by Non-Recourse Promissory Note in the form attached hereto as Exhibit B. Said cash portion shall be prepaid or evidenced by promissory note payable January 20, 1980. (iii) Notwithstanding the provisions of subparagraphs *139 4(e)(i) and (ii) hereof, all payments of advance royalty after the third said payment may be paid entirely by Non-Recourse Promissory Note as described in this subparagraph. Petitioner executed and delivered to Salem a nonrecourse promissory note captioned "Non-Negotiable Secured Notes" dated August 1, 1978, as payment for the annual royalties required by the lease. Even though the note is captioned in the plural, only one nonrecourse promissory note was executed by petitioner on August 1, 1978. Although it is not clear from the record, it appears that petitioner and Salem agreed to change the terms of the third royalty payment so that $ 16,000 cash was payable January 20, 1980, with the remainder payable by nonrecourse note, as set forth below. The note provided that petitioner would pay Salem the sums set forth as follows on the dates set forth with interest at the rate of six and one half (6.5%) per cent, payable as set forth in the Pledge Agreement of even date, but in no event later than August 1, 1985, except payments prior thereto shall be as set forth in Pledge Agreement of even date herewith: $ 238,500
August 1, 1978
$ 230,000
August 1, 1979
$ 249,000
August 1, 1980
$ 265,000
August 1, 1981
$ 265,000
August 1, 1982
$ 265,000
August 1, 1983
$ 265,000
August 1, 1984
*140 The note also provided that to secure the payment of the note, petitioner has granted the Payee a security interest in the collateral described in the Pledge Agreement of even date. [The note] shall in all respects be subject to the conditions of the Pledge Agreement, including, without limitation the recourse to the collateral alone in the event of default in payment of this note. The pledge agreement petitioner executed in favor of Salem on September 28, 1978, granted Salem a security interest in all coal underlying petitioner's leased property and in all proceeds from the sale of coal. The pledge agreement obligated petitioner to pay Salem 72.5 percent of gross receipts actually received by petitioner from coal mined from the leased property. The proceeds were to be applied first against interest and then against principal due on the nonrecourse promissory note. The pledge agreement was to remain in effect until the payment of principal and interest at the maturity of the nonrecourse note. Petitioner timely made the required cash payments to Salem for the advance annual royalties of $ 26,500 in 1978; $ 35,000 on January 20, 1979; and $ 16,000 on January 20, 1980. Petitioner *141 did not make any additional cash payments or tender any additional promissory notes to Salem after January 20, 1980. Therefore, as of September 30, 1981, petitioner had paid a total of $ 77,500 cash to Salem, which represented its adjusted basis in the Pikeville Quadrangle lease. In June 1980, respondent notified petitioner that its Federal income tax returns for the taxable years ended September 30, 1978 and 1979, *236 were under examination and that the Pikeville Quadrangle mineral lease tax shelter was also being examined. Following the examination of the September 30, 1978 and 1979 returns, in which Mr. Eatman represented petitioner, Mr. Eatman attempted to discover the extent of mining activity undertaken in the leased coal seams. Unable to obtain any sufficient information from the promoters of the investment, and based on the status reports sent by Euran since 1979, which described various difficulties with beginning the actual mining, Mr. Eatman believed that no coal would ever be mined under the lease. Therefore, Mr. Eatman was of the opinion that petitioner should "wash [its] hands" of the Pikeville Quadrangle lease and "sever" its relationship with Euran, and so informed *142 Mr. Corra in September 1981. No corporate resolution to this effect was ever adopted by petitioner. Nor did petitioner notify Salem, Hurricane, or Euran of its desire to terminate their relationships. Petitioner contends that by the end of the taxable year ended September 30, 1981, it became apparent that no coal would be mined from the coal seams leased in 1978, thereby causing its investment in the lease to become worthless. Petitioner argues that it effectuated its intent to abandon the Pikeville Quadrangle lease during the taxable year ended September 30, 1981, by not paying Salem the advance royalty due under the lease on August 1, 1981. Consequently, petitioner claims that under section 165(a) it is entitled to an abandonment loss deduction of $ 77,500 sustained in its taxable year ended September 30, 1981, which can be carried back to its taxable year ended September 30, 1978. Respondent contends that petitioner is not entitled to an abandonment loss deduction because it has not sufficiently proven the elements entitling it to claim an abandonment loss under section 165. Section *143 165(a) allows a deduction for any loss sustained during the taxable year which is not compensated for by insurance or otherwise. Under section 165(b) the basis for determining the amount of the deduction for the loss is the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. In general, a deductible loss is sustained "during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year." Sec. 1.165-1(d)(1), Income Tax Regs. Losses claimed with respect to nondepreciable property must also meet the requirements of section 1.165-2, Income Tax Regs., which provides in part: Obsolescence of nondepreciable property. (a) Allowance of deduction. A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is *144 discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or loss of title to the property, occurs. Sustained losses deductible under this section have commonly been referred to as abandonment losses to reflect the requirement of an affirmative act that evidences an intent to discontinue the use or permanently discard nondepreciable property. A.J. Industries, Inc. v. United States, 503 F.2d 660, 670 (9th Cir. 1974); Gulf Oil Corp. v. Commissioner, 87 T.C. 135, 157 (1986). Both the intention of the owner of the asset and the act of abandonment must be ascertained from all of the surrounding facts and circumstances. Massey-Ferguson, Inc. v. Commissioner, 59 T.C. 220, 224 (1972); Boston Elevated Railway Co. v. Commissioner, 16 T.C. 1084, 1108-1109 (1951), *145 affd. 196 F.2d 923 (1st Cir. 1952). Petitioner bears the burden of proving the loss occurred and and is deductible in the year claimed. Boehm v. Commissioner, 326 U.S. 287 (1945); Rule 142(a). In Gulf Oil Corp. v. Commissioner, supra, we discussed certain methods of abandonment with regard to mineral leases. In that case, we reaffirmed our position in Brountas v. Commissioner, 73 T.C. 491, 582-587 (1979), affd. on this issue and revd. in part 692 F.2d 152 (1st Cir. 1982), affd. on this issue and revd. in part sub nom. CRC Corp. v. Commissioner, 693 F.2d 281 (3d Cir. 1982), that a "geological determination of total worthlessness, coupled with the objective cessation of the payment of delay rentals, establishes that a mineral lease has been abandoned." Brountas v. Commissioner, supra, quoted in Gulf Oil Corp v. Commissioner, supra at 161. Additionally, there "may be other ways in which an act of abandonment could have occurred -- such as *146 delivery to the lessor of a legally binding instrument disclaiming further rights under the lease." Brountas v. Commissioner, supra, quoted in Gulf Oil Corp. v. v. Commissioner, supra at 161. Respondent does not dispute that petitioner's Pikeville Quadrangle lease lost its value by the end of the taxable year ended September 30, 1981, or that petitioner's adjusted basis in the lease was $ 77,500. Rather, respondent contends that petitioner has not established that it took *237 the necessary steps required to abandon the lease during the taxable year ended September 30, 1981, or during any other taxable year. Petitioner contends that it has met the requirements entitling it to an abandonment loss deduction under section 165 for the taxable year ended September 30, 1981. From February 1979 through February 1982, Euran periodically sent petitioner correspondence regarding the Pikeville Quadrangle lease, much of it explaining that due to market conditions, strikes, and weather problems, no mining could profitably take place on the property. Nevertheless, in each report, Euran expressed optimism that the problems would soon be rectified and that profitable *147 mining would begin. In January 1980, petitioner began to believe that the leased seams would never be mined, and thus would never be profitable. At that time, petitioner considered abandoning the lease, but ultimately decided to give the investment one more year to show some potential for profit, and made the $ 16,000 cash advance royalty payment due January 20, 1980. However, by the end of the taxable year ended September 30, 1981, it became obvious that no profitable coal mining would ever occur on the property leased from Salem in 1978. To be entitled to an abandonment loss deduction under section 165, a reasonable determination of worthlessness, as adjudged by a prudent and informed businessman standard, must be supported by an act of abandonment as ascertained from the surrounding circumstances. Gulf Oil Corp. v. Commissioner, supra at 163; Massey-Ferguson, Inc. v. Commissioner, supra at 225. Petitioner contends that because it did not have physical assets at the mining site and because the lease with Salem did not formally provide for *148 a method of termination by petitioner, refusing to pay the annual advance royalties was the only definable method available to abandon its lease. Petitioner contends that it affirmatively acted to abandon the Pikeville Quadrangle lease by refusing to pay the $ 265,000 royalty due on August 1, 1981, as required under the lease. Respondent contends that no such obligation existed since all of the annual advance royalty payments for 1981 through 1984 were made in a single nonrecourse note delivered to Salem on August 1, 1978. We agree with respondent. We understand that it is not required that a taxpayer sell, or otherwise dispose of an asset before claiming an abandonment loss with respect to that property. James Petroleum Corp. v. Commissioner, 238 F.2d 678 (2d Cir. 1956), affg. 24 T.C. 509 (1955), cert. denied 353 U.S. 910 (1957); Gulf Oil Corp. v. Commissioner, supra. In fact, it is possible for a taxpayer to abandon an interest in a mineral lease by refusing to make payments under the lease for that interest, even *149 if the lease is not otherwise terminated. Brountas v. Commissioner, supra; Gulf Oil Corp. v. Commissioner, supra at 162. After looking at all of the facts and circumstances ascertainable from the record, we find that petitioner was not obligated to tender a nonrecourse note to Salem on August 1, 1981, and, therefore, did not objectively cease to make payments required by the Pikeville Quadrangle lease. The royalties for 1981 through 1984 were paid in their entirety by the nonrecourse note signed August 1, 1978. Payment of the nonrecourse note was, by the terms of the pledge agreement, contingent upon coal production and the only payments actually required by the nonrecourse note were eventual payments due no later than August 1, 1985. See Wiseman v. Commissioner, T.C. Memo. 1987-364. Since no coal was ever shown to have been mined or sold under the lease, no payments were due pursuant to the nonrecourse note and pledge agreement during the taxable year ended September 30, 1981. Additionally, petitioner did not deliver any instrument to Euran, Hurricane, or Salem, disclaiming its interests in the Pikeville Quadrangle *150 lease, or any of the related contracts. Although such acts may establish that a mineral lease has been abandoned, petitioner has not attempted to establish them in this instance. Therefore, we hold that petitioner has not established that it abandoned the lease by any readily available method, including the cessation of royalty payments, during the taxable year ended September 30, 1981. Furthermore, coupled with the requirement of an affirmative act of abandonment is the intention of the taxpayer to abandon the asset during the taxable year the loss occurs. Massey-Ferguson, Inc. v. Commissioner, supra at 225. Respondent contends that petitioner has failed to establish that it actually intended to abandon the investment during taxable year ended September 30, 1981. Again, we agree with respondent. Petitioner relies solely on the testimony of Mr. Eatman, who was the only witness to testify at trial, to establish its intent. We have no reason to doubt that Mr. Eatman was of the opinion that petitioner should "wash [its] hands" of the Pikeville Quadrangle lease, *151 and so informed Mr. Corra. However, although we recognize that Mr. Eatman was very knowledgeable of petitioner's investment in the Pikeville Quadrangle, we do not believe that Mr. Eatman can testify to petitioner's intentions. Mr. Eatman never had a proprietary interest in petitioner, and was never given the authority to *238 make decisions or to act on behalf of petitioner. Furthermore, petitioner has not produced any testimony from petitioner's principal and majority stockholder, Mr. Corra, to corroborate Mr. Eatman's testimony. Accordingly, we find that petitioner has not established that it intended to abandon the investment during the taxable year ended September 30, 1981. In view of the foregoing, we hold that petitioner is not entitled to an abandonment loss deduction under section 165(a) for the taxable year ended September 30, 1981. Decision will be entered under Rule 155. Footnotes
1. Hereinafter, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩