**CORRA RESOURCES, LTD.,**
**Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 90–3365.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 4, 1991.

Decided Oct. 9, 1991.

---

Arthur H. Boelter, argued, John J. White, Boelter, Silver & Gale, Seattle, Wash., for Corra Resources, Ltd.

Abraham N.M. Shashy, Jr., I.R.S., Gary R. Allen, Jonathan S. Cohen, Christine A. Grant, argued, Dept. of Justice, Tax Div., Appellate Section, Charles S. Casazza, U.S. Tax Court, Washington, D.C., for C.I.R.

Before COFFEY and EASTERBROOK, Circuit Judges, and MORAN, District Judge.*

EASTERBROOK, Circuit Judge.

Corra Resources, an investment vehicle for Edwin Corra and his wife Genevieve, put some of its assets into a coal mining lease in 1978. (Corra Plumbing Co., which made the investment, sold its operating assets in 1980 and was renamed as it became an investment company.) Corra Resources obtained from Salem Minerals the right to mine coal in Pikeville, Kentucky (the "Pikeville Quadrangle" lease); it put down $77,500 as prepaid royalties and hired

Hurricane Mining Co. to do the mining and Euran Energy to manage its interests. Corra Resources paid additional royalties by nonrecourse promissory note. Corra Resources made the last cash payment on January 20, 1980; thereafter it was entitled to sit back and collect any profits that exceeded the sums due under the note.

Corra was not in this alone. Salem assembled a number of investors with the promise of tax benefits. Corra Resources took deductions that produced more than $250,000 in tax savings. These benefits depended, among other things, on coal being mined. Coal was not mined. Euran sent the investors reports explaining why. One year Euran said that bad weather and a weak market prevented mining; another year mild weather was to blame (less need for coal, you see). One report said that electrical utilities had built up large stockpiles of coal, so there was little market for new supplies; another report had it that reduced stockpiles were responsible for the lack of demand. In 1981 the IRS notified investors in the Pikeville Quadrangle that their returns were under examination. In 1984 the IRS assessed deficiencies against Corra Resources and the other investors in this venture. After filing a petition for review in the Tax Court, Corra Resources agreed to be bound by the outcome of a case testing the validity of deductions arising out of the Pikeville Quadrangle leases. The IRS prevailed, *Wiseman v. CIR*, 53 T.C.M. 1432 (1987), leaving Corra Resources searching for a way to salvage something from the debacle.

Leo Eatman, Edwin Corra's confidant and Corra Resources' accountant, concluded that something was fishy when the IRS notice was the first product to emerge from the Pikeville Quadrangle. He testified that after the promoters gave him the runaround, he advised Edwin Corra to have nothing further to do with the venture. Eatman was not an employee of Corra Resources, but Edwin Corra took Eatman's advice on financial matters, and we shall

* Honorable James B. Moran, Chief Judge of the United States District Court for the Northern District of Illinois, sitting by designation.

assume that Corra was agreeable to this recommendation. (Eatman wanted to testify that Corra approved his suggestion but a hearsay objection intervened; Corra himself did not give evidence.) After *Wiseman* foreclosed any effort to preserve the deductions Corra Resources actually took on its tax returns, the firm contended that it was entitled to deduct the $77,500 as the cost of an abandoned asset—the lease. See 26 U.S.C. § 165(a). According to Corra Resources, the abandonment took place in its 1981 fiscal year (which ended September 30, 1981), during which Eatman inquired, did not like what he found, and told Edwin Corra to wash his hands of the business. After a trial, Special Trial Judge Goldberg concluded that Corra Resources had not abandoned the lease in 1981, because it had not taken any step to dissociate itself from the venture. Judge Fay adopted this opinion, 59 T.C.M. 102 (1990), see *Freytag v. CIR*, —— U.S. ——, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991), and entered the judgment from which Corra Resources appeals.

Corra Resources concedes that it took no concrete step. It did not send Salem a letter repudiating the lease (and its notes) on the ground of non-performance by the promoters. It did not tell Hurricane to quit preparing to mine on its behalf. It did not adopt a corporate resolution jettisoning the lease. It did not raise the subject with the IRS until after the Tax Court decided *Wiseman* in 1987. Nonetheless, Corra Resources submits, it abandoned the asset in 1981. The lease was by then objectively worthless, and both Eatman and Edwin Corra mentally walked away from the investment. Corra Resources could not claim the $77,500 as an abandonment loss until 1987, when *Wiseman* stripped it of the deductions it had taken on other grounds. You can't deduct as a loss more than your adjusted basis in an asset; until *Wiseman* that basis was zero. What more does the Commissioner want, Corra Resources asks?

What the Commissioner wants—what the Tax Court held the Commissioner is entitled to demand—is some step that irrevocably cuts ties to the asset. In the words of Regulation 1.165–1(d)(1), the deduction is not available until "the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in [the] taxable year." See also Regulation 1.165–2(a). Investors would love to hold onto an asset in the hope that it will pay off despite long odds, while retaining the option of taking a deduction if it does not. A firm with surplus, and apparently worthless, inventory wants to write it off while keeping it in a warehouse to sell if demand picks up. *Thor Power Tool Co. v. CIR*, 439 U.S. 522, 531–46, 99 S.Ct. 773, 780–88, 58 L.Ed.2d 785 (1979), disapproves of that maneuver, and *Rexnord, Inc. v. United States*, 940 F.2d 1094 (7th Cir.1991), denies a deduction when a sale in practice does no more than move the inventory to a warehouse off the taxpayer's premises. Although these cases were decided under 26 U.S.C. §§ 446 and 471, they illustrate the principle that a taxpayer may not hedge bets at the Treasury's expense. *Thor Power Tool*, 439 U.S. at 545–46, 99 S.Ct. at 787–88. A plea that a spare part (or a lease) has minuscule market value is not enough. Until some observable event (the burning of a warehouse, the sinking of a ship, the sale or scrapping of inventory, the repudiation of a lease) marks the loss, the taxpayer may try to recharacterize the transaction. *Laport v. CIR*, 671 F.2d 1028, 1031 (7th Cir.1982); *John R. Thompson Co. v. United States*, 477 F.2d 164, 168 (7th Cir.1973). Intra-corporate affairs (what Eatman said to Corra, what Corra said to Eatman, what either or both intended) do not generate signs visible to outside observers and therefore do not mark the crossing of the Rubicon. Perhaps Corra Resources would have returned a royalty check had one arrived in 1982, or 1983, or any other year through 1987 (when it first told the IRS that the lease had been abandoned). The Commissioner is entitled to more than the taxpayer's after-the-fact assurance that this is so.

Corra Resources has a legitimate point that it is not so clear how one abandons a mineral lease being managed by a third party—or why, tax considerations aside, a lessee that has no further obligations

would want to. Corra Resources could not pull its equipment out of the mine; it had none there. The lease provided no means of termination or abandonment. And the expedient of withholding delay rentals (sums paid to keep the lease alive during non-mining periods), an observable act extinguishing any opportunity to receive future profits, an act that *Brountas v. CIR*, 692 F.2d 152, 162–63 (1st Cir.1982), and *CRC Corp. v. CIR*, 693 F.2d 281, 283–84 (3d Cir.1982), say would mark abandonment, was not available because Corra Resources made the last required cash installment in 1980 and had delivered in 1978 a nonrecourse note covering all royalties through 1985. Yet Corra Resources was not helpless. It could have sent letters to Salem, Hurricane, and Euran giving up the ghost, and in particular telling Hurricane and Euran to cease making efforts on its behalf. Until doing something of the sort, Corra Resources retained the option to reap the benefits if mining should commence. (As late as October 1981 Euran assured the investors that profitable production was just around the corner.) *Gulf Oil Corp. v. CIR*, 914 F.2d 396, 402 (3d Cir.1990), holds that one who retains all rights to a favorable outcome of a mineral lease may not obtain an abandonment deduction. See also *Davis v. CIR*, 241 F.2d 701, 703–04 (7th Cir.1957) (abandonment of a lease means expiration or termination).

The final sentence of Reg. 1.165–2(a) is not the solace Corra Resources seeks. It says that the "taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs." Corra Resources treats this as eliminating the need for an observable act of abandonment, which is hardly plausible given the requirement of Reg. 1.165–1(d)(1). We understand this language as addressed to a different problem: an asset becomes worthless but the taxpayer waits until an opportune moment (perhaps a year with large profits in search of a tax shield) to supply the act of abandonment. Regulation 1.165–2(a) reserves the Commissioner's right to reallocate this loss to the year in which the asset became worthless. *Laport*, 671 F.2d at 1031 n. 5; *A.J. Industries, Inc. v. United States*, 503 F.2d 660, 668–70 & n. 6b (9th Cir.1974). It does not bestow the privilege that *Thor Power Tool* and Reg. 1.165–1(d)(1) are set against: allowing the investor to hold the asset in the hope of an upturn in its value while reserving the right to declare abandonment during this period of hopeful waiting. Corra Resources did not abandon the lease during 1981. The lease expired in 1986, making that the year in which the loss was realized.

AFFIRMED.