UNITED DAIRY FARMERS, INC., et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. C–1–97–1043.

United States District Court, S.D. Ohio, Western Division.

May 23, 2000.

William Francis Russo, Cynthia L Gibson, Katz, Teller, Brant & Hild Co—1, Cincinnati, OH, for United Dairy Farmer Inc, Robert D Lindner, Jr, Parent and Natural Guardian of Robert D Lindner, III, Alan Bradford Lindner, David Clark Lindner, Co–Trustees of the Robert D Lindner, III Trust, plaintiffs.

Joseph L Meadows, Todd L Treadway, U.S. Department of Justice, Tax Division, Washington, DC, for United States of America, defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

BECKWITH, District Judge.

On its 1993 corporate income tax return, Plaintiff United Dairy Farmers, Inc. ("UDF") took the following deductions: 1) a deduction of $259,980 pursuant to § 162 of the Internal Revenue Code for environmental remediation costs; 2) a deduction of $150,902 pursuant to § 165(a) of the Internal Revenue Code for abandonment losses relating to alleged valueless engineering and relocation studies; and 3) a deduction of $145,253 pursuant to § 162 of the Internal Revenue Code for professional fees incurred as a result of changing from a C corporation to an S corporation.[1] On June 27, 1997, the Internal Revenue Service ("IRS") issued to UDF a Notice of Final S Corporation Administrative Adjustment which declared that these dis-

---

**1.** The parties later reached an agreement regarding the appropriate treatment of $97,453 of these professional fees. Thus, remaining for decision is the appropriate treatment of $47,800 in professional fees. UDF also had a fourth claim for readjustment which it has now abandoned. *See* Joint Final Pre–Trial Statement § IV.B.10.

bursements were capital expenditures not deductible as ordinary expense. The IRS imposed an upward adjustment in UDF's ordinary income for 1993 of $614,603, resulting in an increase in tax liability of $7,744 for the 1993 tax year. Plaintiffs brought this action pursuant to 26 U.S.C. § 6226(e) seeking readjustment of the IRS's determination.

This matter came before the Court on November 29–30, 1999 for a trial to the bench. At issue is whether UDF properly deducted the noted expenditures as either ordinary business expenses or abandonment losses or whether the IRS was correct in declaring that they were capital expenditures. The Court, having considered the pleadings filed by the parties, the evidence presented at trial, and the pre- and post-trial briefs of counsel, hereby enters the following Findings of Fact, Conclusions of Law, and Order. To the extent that the foregoing findings of fact should more properly be considered conclusions of law, and vice versa, they are hereby adopted as such.

I. *The Parties, Jurisdiction, and Venue*

A. *Findings of Fact*

1. Plaintiff United Dairy Farmers, Inc. is an Ohio corporation with its principal place of business located in Cincinnati, Ohio. For federal income tax purposes, UDF has elected to be treated as an S corporation. Complaint ¶ 2.

2. Plaintiff Robert D. Lindner, Jr. is the parent and natural guardian of Robert D. Lindner III, who is a beneficiary of the Robert D. Lindner III Trust dated June 23, 1992 ("the Trust"). *Id.* Introductory Statement

3. Plaintiffs Alan Bradford Lindner and David Clark Lindner are co-trustees of the Trust. *Id.*

4. The Trust is an interested shareholder of United Dairy Farmers, Inc. *Id.* ¶¶ 2, 12.

5. Robert D. Lindner III is required to report for federal income tax purposes the Trust's share of income derived by UDF. *Id.* ¶ 3.

6. The Defendant is the United States of America. *Id.* ¶ 4.

7. This is an action for readjustment pursuant to 26 U.S.C. § 6226(f). *Id.* ¶¶ 17, 20, 23, 25.

8. On June 27, 1997, the IRS issued a Notice of Final S Corporation Administrative Adjustment disallowing certain deductions on UDF's 1993 tax return, resulting in an increase of $614,603 in UDF's ordinary income. *Id.* ¶ 7; Joint Final Pre-Trial Statement (statement of uncontroverted facts) § IV.B.4.

9. The tax matters person for UDF did not file a petition for readjustment within 90 days of the mailing of the Notice of Adjustment. Complaint ¶ 10; Joint Final Pretrial Statement (statement of uncontroverted facts) § IV.B.6.

10. On November 21, 1997, Plaintiffs deposited with the IRS the sum of $7,744, representing the amount by which their tax liability was increased by virtue of the Notice of Adjustment. *Id.* ¶ 13; *id.* Ex. B.

11. Plaintiffs filed this petition for readjustment on November 21, 1997. *See* Complaint.

B. *Conclusions of Law*

Under 26 U.S.C. § 6226, within 90 days after the mailing of a final partnership administrative adjustment, the tax matters partner of such partnership may file a petition for readjustment in the United States district court for the district in which the partnership is located. *See* 26 U.S.C. §§ 6226(a) & (a)(2). If the tax matters partner fails to file a petition for readjustment within the 90 day period, a notice partner, as defined by 26 U.S.C. § 6223, may file a petition for readjustment within 60 days after the expiration of the initial 90 day period. 26 U.S.C. § 6226(b)(1). In order to invoke the jurisdiction of the district court, however, on or before the day the petition is filed, the

petitioner must deposit with the Secretary of Treasury the amount by which the tax liability of the partner is increased by the adjustment. 26 U.S.C. § 6226(e). If the above requirements are met, the district court has jurisdiction to determine all partnership items of the partnership to which the notice of final adjustment relates. 26 U.S.C. § 6226(f). Congress has made the provisions for filing a petition for readjustment fully applicable to Subchapter S corporations. *See* 26 U.S.C. § 6244. The tax matters person for a Subchapter S corporation may thus file a petition for readjustment using these procedures. *Smith S, Inc. v. Commissioner of Internal Rev.*, 837 F.Supp. 130, 132 (E.D.N.C.1993). Therefore, the shareholder of an S Corporation may bring a petition for readjustment if the tax matters person of such corporation fails to do so. *See, e.g., Ohio Periodical Dist., Inc. v. Commissioner of Internal Rev.*, 105 F.3d 322, 323 n. 1 (6th Cir.1997).

In this case, the IRS issued its notice of adjustment on June 27, 1997. The tax matters person for UDF did not file a petition for readjustment within the 90 day period enumerated in § 6226(a). Therefore, the Trust, as a shareholder of UDF, a subchapter S corporation, was permitted to file a petition for readjustment with the district court within 60 days after the expiration of the 90 day period or, in other words, within 150 days of the mailing of the notice of adjustment, provided, however, it first deposited with the Secretary of Treasury the amount by which the tax liability of the shareholder was increased. Plaintiffs deposited the amount of the tax liability with the Secretary on November 21, 1997 and filed the instant petition for readjustment on the same day, which was 147 days after the mailing of the notice of adjustment. Plaintiffs therefore complied with all the jurisdictional prerequisites for filing a petition for readjustment.

Accordingly, the Court concludes that it has subject matter jurisdiction over Plaintiff's petition for readjustment.

## II. *Environmental Remediation Costs*

### A. *Findings of Fact*

1. In 1985, UDF purchased from Southland Corporation approximately 60 7–Eleven convenience stores. One of these stores, Store # 649, was located at the corner of Sullivant Avenue and Hague Avenue in Columbus, Ohio. Tr. at 17. The purchase price was $315,000. *Id.* at 18.

2. At the time UDF purchased Store 649, 7–Eleven was not conducting any retail gasoline sales at that location. *Id.* at 17.

3. Unbeknownst to UDF, both Shell Oil Company and Certified Oil Company had both previously operated retail gasoline stations on this property. Therefore, the ground on which Store 649 was located contained underground gasoline storage tanks. The tanks had leaked, causing the soil to become contaminated. *Id.* at 18, 19, 21, 22, 51.

4. UDF did not cause the soil contamination on the lot for Store 649. *Id.* at 17–27.

5. UDF spent $136,864.07 to remediate the soil on the lot for Store 649. *Id.* at 26; Plaint. Ex. 1A. Except for $100, all of these expenditures occurred in 1990. *See* Ex. 1A.

6. UDF deducted the environmental remediation costs for Store 649 on its 1993 corporate tax return as operating expenses pursuant to § 162(a) of the Internal Revenue Code. Tr. at 158–59; Joint Pretrial Statement (statement of uncontroverted facts) § IV.B.1.

7. In 1989, UDF reached an agreement with Joseph Rippe to purchase a property located at the intersection of Winton Road and North Bend Road for a price of $450,000. UDF designated this location as Store 140. At that time, a Sumerel Tire Store was being operated at this location. No retail gasoline sales were being made on the location at that time. *See* Tr. at 39–40; Joint Ex. V.

8. Sun Oil Company had previously operated a retail gasoline station on the site of Store 140, consequently, this location also contained underground gasoline storage tanks. These tanks leaked, causing soil contamination to the property. Tr. at 43, 44, 47, 50–51.

9. UDF spent $123,697.66 to remediate the soil on the lot for Store 140. All of these costs were incurred in 1991. Plaint. Ex. B.

10. UDF deducted the soil remediation costs for Store 140 on its 1993 corporate income tax return as business expenses pursuant to § 162(a) of the Internal Revenue Code. Joint Final Pretrial Statement (statement of uncontroverted facts) § IV.B.1.

11. Both Store 649 and Store 140 were worth less in a contaminated state than the prices paid for them by UDF. Tr. 27–28, 41, 45.

### B. *Conclusions of Law*

■ The issue presented here is whether UDF properly deducted the remediation costs of Store 649 and Store 140 as ordinary business expenses under § 162 of the Internal Revenue Code, or whether, as the IRS contends, UDF was required to capitalize these costs pursuant to § 263 of the Internal Revenue Code. For the reasons that follow, the Court finds that UDF could not properly deduct these remediation costs as ordinary business expenses.

Section 162(a) of the Internal Revenue Code provides: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]" 26 U.S.C. § 162(a). Under regulations promulgated by the IRS, the

costs of necessary repairs may also be deducted as expenses:

> The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures.

26 C.F.R. § 1.162–4. However, under § 263 of the Internal Revenue Code, capital expenditures are not deductible: "No deduction shall be allowed for ... [a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." 26 U.S.C. § 263(a)(1). The taxpayer has the burden of "clearly showing the right to the claimed deduction." *INDOPCO, Inc. v. Commissioner of Internal Rev.*, 503 U.S. 79, 84, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992). In order to qualify for a deduction under § 162(a), the expenditure must: 1) be "paid or incurred during the taxable year"; 2) be for "carrying on any trade or business"; 3) be an "expense"; 4) be a "necessary" expense;[2] and 5) be an "ordinary" expense.[3] *Id.* at 85, 112 S.Ct. 1039. The distinctions between capital expenditures and current expenditures are not clear, therefore, determination of the issue will depend on the particular facts of the case. *Id.*

The parties, particularly Plaintiffs it seems, rely on a series of Internal Revenue Service Revenue Rulings, Technical Advice Memoranda, and other publications in support of their positions.[4] Of rele-

---

**2.** "Necessary" means that the expense be "appropriate and helpful for the development of the taxpayer's business." *Id.* at 85 (internal cites and quotations omitted).

**3.** "Ordinary" means that the expense must relate to a transaction of common or frequent occurrence in the type of business involved. *Id.*

**4.** Although not binding as precedent, IRS revenue rulings are entitled to considerable weight where they involve the contemporaneous construction of a statute and have been in long use. *United States v. Wisconsin Power & Light Co.*, 38 F.3d 329, 334 (7th Cir.1994). Technical advice memoranda cannot be cited as precedent by statute. They do, however,

vance here are Revenue Ruling 94–38, Technical Advice Memorandum 1995–41005 (October 13, 1995), and Industry Specialization Program Coordinated Issue, Petroleum Industry, *Replacement of Underground Storage Tanks at Retail Gasoline Stations* (January 9, 1998).

Revenue Ruling 94–38 involved a corporation who in 1970 acquired a parcel of land in an uncontaminated state. Over the years, the corporation buried hazardous industrial waste on the property which caused contamination. After approximately twenty years of this activity, the corporation decided to remediate the property. It therefore, excavated the contaminated soil and replaced it with clean soil. The corporation also constructed ground water treatment facilities, which included wells, pipes, and pumps, and other equipment to extract, treat and monitor contaminated groundwater. The question then arose whether these remediation costs should be expensed or capitalized.

In addressing the question, the IRS noted that under the regulations, capital expenditures include expenditures which add value, substantially prolong the useful life of the property to the owner, or adapt the property to a new and different use. Under the facts of the case, the IRS ruled that the costs of remediating the soil and the groundwater were current expenses because they did not add value to the property. Rather, these expenditures merely restored the property to its approximate condition before the corporation's operations caused the contamination. The corporation was required, however, to capitalize the costs of the groundwater treatment and monitoring facilities.

In Technical Advisory Memorandum 1995–41005, a corporation acquired a parcel of real property which became a site for disposal of industrial waste. After a period of this activity, the corporation donated the land to the local county in order to construct a recreational park. After the land was deeded over to the county, the

county discovered that the land was contaminated. It therefore conveyed the land back to the corporation for $1. Later, the Environmental Protection Agency required the corporation to remediate the contamination. The corporation, relying on Revenue Ruling 94–38, sought to deduct its remediation costs as expenses under § 162(a). *See* 1995 WL 601879, at 6. The IRS, however, distinguished Revenue Ruling 94–38 on the grounds that 94–38 was based on the "restoration principle", in which one compares the restored condition of the land to the uncontaminated condition of the land when the taxpayer acquired it:

> The restoration principle envisions that the taxpayer acquire the property in a clean condition, contaminate the property in the course of its everyday business operations, and incur costs to restore the property to its condition at the time the taxpayer acquired the property.

*Id.* The restoration principle did not apply in TAM 1995–41005 because the corporation did not acquire the property in an uncontaminated condition. The IRS continues to distinguish Revenue Ruling 94–38 on the grounds that the property was contaminated when the taxpayer acquired it. *See* Technical Advice Memorandum 1999–52075 (December 29, 1999), 1999 WL 1268310, at 2 ("To the extent Taxpayer's cleanup costs are allocable to contamination that occurred prior to Taxpayer's acquisition of the property, Taxpayer must capitalize those costs under § 263 and the applicable rules under § 263A.").

The facts in this case, then, are distinguishable from Revenue Ruling 94–38 and comparable to TAM 1995–41005 on two grounds. First, the sites for Store 649 and Store 140 were already contaminated when UDF purchased them. Thus, UDF's remediation efforts did not "restore the property to its condition at the time the taxpayer bought it." Second, UDF did not contaminate the properties through its

provide evidence of administrative practice. *Id.* at 335.

normal business operations, the previous owners did. Even the IRS Industry Specialization Program Coordinated Issue, upon which UDF relies, and which generally states that soil remediation costs incurred as a result of underground storage tank leakage are deductible under § 162(a), is careful to note that § 162(a) applies where "the soil or groundwater is contaminated by [contaminants] *released from [the taxpayer's] UST's during the course of its business operations* [.]" 1998 WL 6541, at 16 n. 1. (emphasis added). Clearly, then, based on administrative practice, Revenue Ruling 94–38 is inapplicable to UDF's situation.

The Court does not believe, however, that it is sufficient alone to compare and/or distinguish these administrative rulings from UDF's situation and rule that UDF's remediation costs are not deductible under § 162. The Court finds additionally that UDF's remediation expenditures did in fact increase the value of the respective properties. Therefore, those costs must be capitalized. UDF argues that it did not know the extent of the contamination of the properties when it purchased them, and that, therefore, its remediation expenditures merely restored the properties to the values it believed them to have. In actuality, UDF's arguments and the testimony in support of them are tacit admissions that the market values of the properties were really lower because of the presence of contamination. *See* F.F. 11. In other words, UDF admits that it over-paid for the properties. UDF would have to concede that had the prices of the properties been adjusted to reflect the contamination on the properties, its remediation expenditures would have increased the values of the properties, and,

therefore those costs would have to have been capitalized.[5] The Court sees no reason for the taxpayer's subjective belief as to the value of the property to control the determination of whether its remediation costs are deductible or whether they must be capitalized. Indeed, there are good policy reasons that it should not. Such a rule would discourage taxpayers from proceeding with appropriate diligence in making such an acquisition, sure in the knowledge that whatever costs they incurred to salvage their investment would be deductible immediately. This does not seem to be a wise course to follow.

As demonstrated, the appropriate inquiry is whether the taxpayer's expenditures resulted in an improvement of the property in comparison to its condition at the time of acquisition. In this case, it is clear that UDF's expenditures resulted in an improvement of the condition of Stores 649 and 140 and an increase in, and not restoration of, the values to the properties. Consequently, UDF was required to capitalize its remediation costs.

Accordingly, the IRS did not err in adjusting UDF's 1993 ordinary income by disallowing the deduction of these costs under § 162(a). Therefore UDF's first claim for readjustment is not well-taken. Based on this conclusion, the Court need not consider whether UDF made a timely deduction of its remediation expenses.

### III. *Abandonment Losses*

#### A. *Findings of Fact*

1. Between 1986 and 1988, UDF paid Sieberling Associates, Inc. a total of $31,906.30 for engineering studies related to redesigning the clean-in-place ("CIP")

---

5. *See e.g.* TAM 1999–52075 (December 29, 1999):

> However, to the extent Taxpayer's cleanup costs are allocable to the remediation of contamination that was present when Taxpayer acquired the Site, that portion of the overall cost may not be deducted under § 162. Unlike the environmental cleanup addressed in Rev. Rul. 94–38, the cleanup

> of pre-existing contamination does more than restore the Site to the condition that existed at the time Taxpayer purchased it. Rather, these costs constitute an improvement or betterment to the Site compared to its condition when acquired. Accordingly, this portion of the overall cleanup cost must be capitalized under §§ 263 and 263A.

1999 WL 1268310, at 10.

944

systems of its Norwood manufacturing plant. Tr. 121–22; Plaint. Ex. 2A.

2. UDF has never implemented or otherwise utilized the Sieberling studies. Tr. at 123. In the mid–1990's, UDF did, however, commission another team of engineers to design yet another CIP system. *Id.* at 149–50. UDF actually implemented this system. *Id.*

3. On its 1993 corporate tax return, UDF deducted the costs of the Sieberling studies as abandonment losses pursuant to § 165 of the Internal Revenue Code. Joint Final Pretrial Statement (statement of uncontroverted facts) § IV.B.2.

4. During 1987, UDF paid to Hixson, Inc. a total of $37,326.51 for engineering studies related to expanding the ice cream room of the Norwood manufacturing plant. Tr. at 124–26.

5. UDF has never implemented or otherwise utilized these studies. *Id.* at 126. In the late 80's, UDF converted the space into which it was considering expanding its ice cream room into a computer room. *Id.*

6. On its 1993 corporate tax return, UDF deducted the costs of these studies as abandonment losses pursuant to § 165 of the Internal Revenue Code. Joint Final Pretrial Statement (statement of uncontroverted facts) § IV.B.2.

7. Between 1991 and 1993, UDF paid Hixson, Inc. a total of $37,903.60 for studies related to selecting an appropriate site for its Cincinnati distribution center. Tr. at 129, 144–45; Plaint. Ex. 2C. UDF only intended to construct one distribution facility. *Id.* at 145.

8. On its 1993 corporate tax return, UDF deducted the costs of these studies as abandonment losses pursuant to § 165 of the Internal Revenue Code. Joint Final Pretrial Statement (statement of uncontroverted facts) § IV.B.2.

9. Between 1986 and 1992, UDF paid $43,779.72 to various entities for what it termed "New Site Feasibility Studies." Plaint. Ex. 2D. Of this amount:

a. A total of $1,228.47 was paid to John J. Vorderbrueggen for electrical engineering studies. Plaint. Ex. 2D, at 2. UDF in fact implemented these studies. Tr. at 130.

b. A total of $4,300.25 was paid to Bonar Engineering for engineering studies related to increasing the freezing capacity of the Norwood plant. Tr. at 130–31; Plaint. Ex. 2D, at 3. UDF never implemented or otherwise utilized this study. *Id.* at 131.

c. A total of $16,251.00 relates to a "Balance from Project 19 for 1989". Plaint. Ex. 2D, at 3. UDF is unable to account for or otherwise identify why these expenses were incurred. Tr. at 132; 162.

d. A total of $22,000 was paid to Advanced Handling Systems for a study related to improving the manner in which UDF moves its products from the factory to the retail stores. Tr. at 132–33; Plaint. Ex. 2D, at 6. UDF has never implemented or otherwise utilized this study. Tr. at 133.

10. On its 1993 corporate tax return, UDF deducted the costs of these studies as abandonment losses pursuant to § 165 of the Internal Revenue Code. Joint Final Pretrial Statement (statement of uncontroverted facts) § IV.B.2.

11. During the early 1990's, UDF decided to switch the focus of its operations from manufacturing to distribution. Tr. at 117–19.

12. Toward that end, in 1993, UDF committed between $12 million and $15 million to build a new distribution facility in Erlanger, Kentucky. *Id.* at 119–20. The Erlanger distribution center became operational in 1995. *Id.* at 150.

13. Despite UDF's shift in focus from manufacturing to distributing and construction of the Erlanger distribution center, re-modeling of and investment in the Norwood manufacturing facility continued. Tr. 120–21, 149–50.

## B. Conclusions of Law

The issue presented here is whether UDF could properly deduct the above noted expenditures pursuant to § 165 of the Internal Revenue Code. Section 165 provides: "General rule—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a). In order to take an abandonment loss under § 165(a), "a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and ... sustained during the taxable year." 26 C.F.R. §§ 1.165–1(b) & (d). IRS regulations further provide that "[o]nly a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." *Id.* § 1.165–1(b). The "identifiable event" must be an event which is observable to outsiders and "is some step which irrevocably cuts ties to the asset." *Corra Resources, Ltd. v. Commissioner of Internal Rev.*, 945 F.2d 224, 225 (7th Cir.1991).

UDF's position is that the decision to shift focus from manufacturing to distribution and the decision to invest in the Erlanger distribution facility are the "identifiable events" which rendered the expenditures on the engineering and other studies worthless. Since the decision to invest in the Erlanger facility was made in 1993, UDF contends that 1993 was the proper year to recognize these expenditures as losses. On the other hand, the IRS contends that these expenditures are all part of an integrated plan to construct the Erlanger facility. Therefore, these expenditures must be capitalized into the cost of constructing that facility. Alternatively, the IRS argues that the construction of the Erlanger facility was not the "identifiable event" which rendered those studies worthless.[6] The Court agrees with the IRS that, with the exception of the payments to Hixson for new site studies, the decision to construct the Erlanger facility is not the "identifiable event" which rendered the other studies worthless. With respect to the Hixson payments, however, the Court finds that these expenditures were part of an integrated plan to construct the Erlanger facility and, therefore, they must be capitalized into the cost of building that facility.

In determining whether expenditures for professional and/or consulting fees may be expensed as abandonment losses, the initial inquiry is whether the proposals were true alternatives, i.e., mutually exclusive options, or whether they were separate and distinct projects, any or all of which the taxpayer might have accepted and implemented. *Sibley, Lindsay & Curr Co. v. Commissioner of Internal Rev.*, 15 T.C. 106, 110, 1950 WL 33 (1950). If the proposals are true alternatives, or part of an integrated plan, the costs of the proposals not adopted or implemented must be capitalized as part of the cost of the proposal adopted or implemented. *Id.; Nicolazzi v. Commissioner of Internal Rev.*, 79 T.C. 109, 130, 1982 WL 11126 (1982). On the other hand, if the proposals are not mutually exclusive, then the taxpayer may possibly deduct the cost of the project(s) not pursued. *Sibley,* 15 T.C. at 110, 1950 WL 33. However, even if the proposals were not mutually exclusive, in order to qualify for § 165 deduction, the court must still determine whether the transactions were closed and completed during the relevant tax year. *Nicolazzi,* 79 T.C. at 130, 1982 WL 11126. The taxpayer's subjective opinion that the loss

6. The Court notes at this that UDF admits that it actually implemented the engineering study provided by John J. Vorderbrueggen and that it should not have deducted the expenditure of $1,228.47 on its tax return. *See* F.F. 9; Doc. No. 32, at 23 n. 1. UDF also concedes that it cannot substantiate the deduction for $16,251.00 related to the "Bal-ance from Project 19 for 1989". Therefore, UDF has abandoned its claims to entitlement to those deductions. *See* Doc. No. 32, at 23 n. 23. Consequently, these claims for deductions are now without merit and to that extent judgment will be granted in favor of the United States.

occurred in the year claimed is not sufficient to carry its burden that the deduction was appropriate. *Boesel v. Commissioner of Internal Rev.*, 208 F.2d 817, 819 (2d Cir.1954).

The Court would agree with UDF that Sieberling study relating to the Norwood CIP systems, the Hixson study relating to expansion of the Norwood ice cream room, the Bonar Engineering study relating to increasing Norwood ice cream freezing capacity, and the Advanced Handling Systems study relating to product flow are projects separate and distinct from the Erlanger project, any or all of which UDF might have implemented. The Court disagrees, however, that the Erlanger project is the identifiable event which closed and completed these transactions. For instance, with respect to the Sieberling CIP study, the logical, identifiable event which evidences the loss of that asset is not the Erlanger project, but subsequent commissioning and implementation of another, separate CIP system. The implementation of the new CIP proposal would clearly indicate to an outside observer the intent to abandon the first CIP proposal. The same logic obtains with respect to the Hixson study for expansion of the ice cream room. In the late 1980's UDF converted the space into which it was considering expanding the ice cream room into a computer room. *See* F.F. 5. The conversion of this space into a computer room clearly evidenced an intent to abandon the proposal to convert the space into an ice cream room. Therefore, this was the identifiable event which caused the loss of the Hixson proposal.

The Court further finds that the Bonar Engineering study and the Advanced Handling Systems study retain their value to UDF despite the construction of the Erlanger facility. Although these projects, which were proposals for the Norwood facility, could have been implemented in addition to the construction of the Erlanger facility, the Court does not find credible UDF's contention that the Erlanger deci-

sion caused it to totally abandon these other projects. The Court cannot square UDF's position that the Erlanger project caused it to decide not invest further in the Norwood plant when it commissioned a new CIP study soon after claiming that the Erlanger project caused it to abandon the first CIP study. This action tends to show that UDF's concept of whether a project has been abandoned is transitory in nature. A taxpayer may not hedge his bets, hoping for an upturn in an asset's value, while at the same time waiting for an advantageous moment to supply the act of abandonment. *See Corra Resources*, 945 F.2d at 227.

Finally, it is clear that the payments of $37,903.60 to Hixson, Inc. for new site feasibility studies should have been capitalized into the cost of the Erlanger distribution center. All of the invoices indicate that the charges were incurred pursuant to a November 7, 1990 authorization letter for the "Cincinnati Distribution Center." *See* Plaint. Ex. 2C. UDF admits that it only intended to build one Cincinnati area distribution center. *See* F.F. 7. Therefore, the costs incurred for new site feasibility studies were part of an integrated plan to build one distribution center and must be capitalized. *See Nicolazzi*, 79 T.C. at 130–31, 1982 WL 11126. These expenditures are also in the nature of "pre-opening costs"—costs incurred to create or acquire a capital asset—which must be capitalized into the cost of the capital asset. *See Johnsen v. Commissioner of Internal Rev.*, 794 F.2d 1157, 1161 (6th Cir.1986); *Sorrell v. Commissioner of Internal Rev.*, 882 F.2d 484, 488 (11th Cir.1989).

Accordingly, the IRS did not err in disallowing these abandonment costs. Therefore, UDF's second claim for readjustment is not well-taken.

## IV. *Accounting Fees*

### A. *Findings of Fact*

1. Prior to January 1, 1993, UDF was a Subchapter C corporation under the provi-

sions of the Internal Revenue Code. Tr. at 79.

2. In 1992, UDF decided to change its corporate form from a C corporation to an S corporation. Tr. at 59. In order to facilitate this change in form, in October 1982, UDF created a new S corporation called Uncle Bud's Fried Dough, Inc. *Id.* UDF, Inc. was then merged into Uncle Bud's Fried Dough, Inc. *Id.* at 59–60. Uncle Bud's Fried Dough, Inc. had no assets prior to the merger. *Id.* at 59. Uncle Bud's Fried Dough, Inc. then changed its name to United Dairy Farmers, Inc. The sole purpose of the merger was to effect an S election for UDF in order to reduce tax liability to the individual shareholders. *Id.* at 63, 80–83. The merger did not otherwise result in any change to UDF's corporate structure or its business operations. *Id.* at 59–60.

3. In connection with the merger, UDF paid the accounting firm of Ernst & Young a total of $46,300, which was billed as follows:

   a. Invoice No. 1165T, dated December 2, 1992, for services rendered through October 31, 1992—$6,800.00. This invoice was approved for payment on January 7, 1993.

   b. Invoice No. 1205T, dated February 1, 1993—$34,400.00. This invoice does not indicate the period for which the services were rendered.

   c. Invoice No. 2550T, dated April 26, 1993, for services rendered through March 31, 1993—$2,700.00.

   d. Invoice No. 2661T, dated July 2, 1993—$3,900.00. This invoice does not indicate the period for which the services were rendered.

*See generally* Plaint. Ex. 3.

4. On its 1993 corporate tax return UDF deducted these expenditures as ordinary and necessary business expenses pursuant to § 162 of the Internal Revenue Code. Joint Final Pretrial Statement (statement of uncontroverted facts) § IV.B.3.

5. UDF is an accrual method taxpayer. Joint Ex. I, at 577.

**B. *Conclusions of Law***

The issue presented here is whether the accounting fees incurred by UDF to effect an S election are deductible as business expenses under § 162 or whether they must be capitalized under § 263 of the Internal Revenue Code. UDF claims that these fees are nothing more than tax compliance costs which are normally deductible. The IRS claims these fees are corporate reorganization costs which must be capitalized. Alternatively, the IRS argues that the change from a C corporation to an S corporation produced benefits to the company extending past the taxable year in which the expenses were incurred. Therefore, these costs must be capitalized. Finally, the IRS argues that the expenses for the S election actually incurred during 1992, and therefore, were not deductible in 1993.

Initially, the Court notes that whatever label, expense or capital expenditure, one wishes to place on Invoice No. 1165T for $6,800, it clearly was not deductible as an ordinary business expense in 1993. UDF is an accrual method taxpayer. *See* F.F. 5. As an accrual method taxpayer, UDF is required to recognized expenses when they are incurred, not when they are actually paid. *Ford Motor Co. v. Commissioner of Internal Rev.,* 71 F.3d 209, 213 (6th Cir.1995). An accrual method taxpayer must deduct an expense in the taxable year when all the events have occurred that establish the fact of liability giving rise to the deduction and the amount of the liability can be determined with reasonable accuracy. *Id.* Invoice No. 1665T satisfies these criteria for deductibility in 1992. The invoice clearly states that it is for services rendered through October 31, 1992 and is payable immediately upon receipt. *See* Ex. 3, at 1. Furthermore, the amount of the liability can be determined with certainty. Therefore, all the events for establishing the fact of the liability for

that invoice occurred in 1992. Thus, if deductible at all, this invoice was only deductible in 1992. Therefore, to that extent, Plaintiffs' third claim for readjustment is not well-taken.

The IRS argues that the expenses for the remaining invoices must have been incurred in 1992 because it would be unusual that these accounting services would have been performed after the merger. The Court disagrees with the IRS's logic. While it may be true that the actual services billed for in the remaining invoices were performed in 1992, the all events test for deductibility in 1992 is not satisfied because the liability could not have been established with reasonable accuracy in 1992. Until Ernst & Young tabulated the hours of service it provided and itemized what the services were for, UDF could not fix the amount of the liability with any accuracy. The invoices clearly establish that Ernst & Young did not provide this information to UDF until 1993. Therefore, if invoices 1205T, 2550T, and 2661T truly represent ordinary business expenses, then they were properly deductible in 1993.

█ The Court agrees with the IRS, however, that the accounting expenses related to the S election and merger with Uncle Bud's Fried Dough, Inc. are corporate reorganization expenses which must be capitalized pursuant to § 263 of the Internal Revenue Code. It is well-established that expenses incurred for professional fees related to corporate reorganizations must be capitalized. *INDOPCO, Inc.*, 503 U.S. at 89, 112 S.Ct. 1039. The record establishes that the merger of United Dairy Farmers, Inc. with Uncle Bud's Fried Dough, even if done only for purposes of making an S election, was a reor-

ganization within the meaning of the Internal Revenue Code.

Under § 368(a)(1)(A), a "reorganization" includes "a mere change in identity, form, or place of organization of one corporation, however effected[.]" 26 U.S.C. § 368(a)(1)(F). Under this section:

> The term "mere change in identity (or) form" obviously refers to the situation which represents a mere change in form as opposed to a change in substance. Whatever the outer limits of section 368(a)(1)(F), it can clearly be applied where the corporate enterprise continues uninterrupted, except for a distribution of some liquid assets or cash. Under such circumstances, there is a change of corporate vehicles but not a change in substance ... At least where there is a complete identity of shareholders and their proprietary interests, as here, we hold that the type of transaction involved is a type (F) reorganization.

*Davant v. Commissioner of Internal Rev.*, 366 F.2d 874, 884 (5th Cir.1966). Thus, *Davant* establishes the criteria for determining whether there has been a "F" reorganization: an identity of shareholders and their proprietary interests, unimpaired continuity of the essential business enterprise, and a new form which is the alter ego of the old. *Performance Sys., Inc. v. United States*, 382 F.Supp. 525, 529 (M.D.Tenn.1973), *aff'd*, 501 F.2d 1338 (6th Cir.1974). In this case, the merger of United Dairy Farmers, Inc. with Uncle Bud's Fried Dough, Inc. had all the hallmarks of an "F" reorganization: an identity of shareholders, unimpaired continuity of the business enterprise, and a new form which is the alter ego of the old. *See* Tr. at 60.[7] Because the United Dairy Farm-

---

7. During trial, the following exchange occurred between counsel for Plaintiffs and Robert D. Lindner, Jr., President and Chief Executive Officer of UDF at the time of the merger:

> Q. Did the company look any different the before and the day after [the merger]?

> A. No.

> Q. Was its total assets on its balance sheet [sic], were they any different the day before or the day after [the merger]?

> A. No.

ers, Inc./Uncle Bud's Fried Dough, Inc. merger was a reorganization within the meaning of the Internal Revenue Code, the costs associated with the merger, i.e. the Ernst & Young accounting fees, are not deductible under § 162(a), but rather must be capitalized under § 263.

Accordingly, the IRS did not err in disallowing these deductions. Therefore, Plaintiffs' third claim for readjustment is not well-taken.

### Conclusion

In conclusion, Plaintiffs' petition for readjustment of the Internal Revenue Service's Notice of Final S Corporation Administrative Adjustment dated June 27, 1997 is not well-taken. Plaintiffs' claims for readjustment are **DISMISSED WITH PREJUDICE**. The Clerk of Court is directed to enter judgment in this matter in favor of the United States.

**IT IS SO ORDERED.**

Q. Did its daily operating—or its daily operations, were they different the day before or the day after [the merger]?

A. It was the same. The only people that would have realized it would have been the people in the tax department.

Tr. at 60.